323 P.2d 261

David E. HOWARD; Bountiful Livestock Company, a corporation; Albert L. Bosley; Emma Jane Bosley; Lagoon Company, formerly Simon Bamberger Company, a corporation; Columbia Powder Company, a corporation; The Cudahy Packing Company, a corporation; George Hill; Leone K. Hill; Clyde Hill; Lillian E. Hill; Illinois Powder Manufacturing Company, a corporation; William V. Morgan; Portland Cement Company of Utah, a corporation; Salt Lake City, a municipal corporation; Salt Lake Pipe Line Company, a corporation; Salt Lake Refining Company, a corporation; Standard Oil Company of California, a corporation; Alva Harrison Tippetts; Woneighta Tippetts; Utah Oil Refining Company, a corporation; Utah Power & Light Company, a corporation; Carl S. Ure, and Western States Refining Company, a corporation, Plaintiffs and Respondents,

v.

TOWN OF NORTH SALT LAKE, a municipal corporation of the State of Utah, Defendant and Appellant.

No. 8697.

Supreme Court of Utah.

March 28, 1958.

Hansen, Baldwin & Allen, Robert W. Brandt, Salt Lake City, Walter L. Budge, Asst. Atty. Gen., for appellant.

S. N. Cornwall, Wesley G. Howell, Homer Holmgren, Asst. City Atty., Salt Lake City, for respondents.

WORTHEN, Justice.

Defendant appeals from a judgment of the trial court in disconnecting lands belonging to the plaintiffs from the corporate limits of defendant town. The disconnection was made under the provisions of Chapter 4, Title 10, U.C.A.1953. Section 10–4–1, U.C.A.1953 provides:

"Whenever a majority of the real property owners in territory within and lying upon the borders of any incorporated city or town shall file with the clerk of the district court of the county in which such territory lies a petition praying that such territory be disconnected therefrom, and such petition sets forth reasons why such territory should be disconnected from such city or town, and is accompanied with a map or plat of the territory sought to be disconnected, and designates no more than five persons who are empowered to act for such petitioners in such proceedings, the court shall cause a notice of the filing of the same to be served upon said city or town in the same manner as a summons in a civil action, and shall also cause notice to be published for a period of ten days in some newspaper having general circulation in such city or town. Issue shall be joined and the cause tried as provided for the trial of civil causes as nearly as may be. The proper authorities of such city or town, or any person interested in the subject-matter of said petition, may appear and contest the granting of the same."

Section 10–4–2, U.C.A.1953 provides:

"If the court finds that the petition was signed by a majority of the real property owners of the territory concerned and that the allegations of the petition are true and *that justice and equity require that such territory* or any part thereof *should be disconnected* from such city or town, it shall appoint

three disinterested persons as commissioners to adjust the terms upon which such part shall be so severed as to any liabilities of such city or town that have accrued during the connection of such part with the corporation, and as to the mutual property rights of the city or town and the territory to be detached." (Emphasis added.)

The plaintiffs are real property owners whose premises were disconnected from the town by decree of the trial court. They will be referred to herein as "plaintiffs" or "respondents." The defendant Town of North Salt Lake will be designated as the "Town" or "appellant."

The Town was organized in 1946. In 1950 it had a population of some 255 persons. Its population at the time of trial was estimated at about 1,150 persons. At the time of organization the Town embraced an area of approximately 480 acres which extended along the main highway between Salt Lake City and Ogden and lay on both sides of the tracks of the Union Pacific Railroad and the Denver & Rio Grande Western Railroad. The southerly boundary line of the Town is northerly boundary line of Salt Lake City and Salt Lake County.

On April 21, 1952, the Town enacted an ordinance of annexation whereby there was added to the Town over 3,440 acres or an area seven times the area of the Town when organized. The real property concerned in this action was all included in the property annexed on April 21, 1952. Certain real property adjacent to and immediately west of the original Town belonging to Cudahy Packing Company, Salt Lake Stock Yards, Hercules Powder Company and Atlas Powder Company, was excluded. The excluded territory is completely surrounded by the Town as constituted following the April 21, 1952 annexation, and will be referred to herein and on the photograph of Exhibit 2 herein as the Island. This exclusion left the properties of Hercules and Atlas Powder Companies outside the Town whereas the properties of Illinois and Columbia Powder Companies, a short distance west of the other two, were annexed.

Exhibit 2, received in evidence, is a map of North Salt Lake and adjacent area. It is a colored map with different colors representing the different areas. A photograph of the exhibit is set out on the following page with letters "A," "B," "C," and "D" substituted in the photograph for the colors on the exhibit. It will be noted that the combined areas "C" and "D" were the lands annexed to the Town April 21, 1952. The area "C" is the area disconnected from the town by the decree of the trial court. The area "B" is the Island of territory not a part of the Town and the area "A" constitutes the limits of the Town prior to April 21, 1952.

EXHIBIT 2

Between 1946 and April 1952 certain companies, particularly those relating to the petroleum industry, purchased lands in Davis County outside and westerly of the cor-

porate limits of the Town and established their plants and facilities thereon. Prior to 1948 the disconnected territory was used for farming and grazing purposes and the storage of explosives in powder magazines. In 1948 Standard Oil Company of California established an oil refinery in the Salt Lake area and its subsidiary Salt Lake Refinery Company acquired for that purpose approximately 588 acres in one tract, about 468 acres of which is located within the disconnected territory, the remainder being in Salt Lake City. Salt Lake Pipe Line Company and Standard Oil Company of California acquired some of said land. These three companies, together with Portland Cement Company and the powder companies, constitute the principal industrial enterprises within the disconnected territory.

An examination of the photograph of Exhibit 2 discloses that after the annexation of April 21, 1952, the Town is bisected by the railroad tracks of the Union Pacific and Rio Grande. Westerly of the tracks and extending to the Jordan River (which constitutes the west boundary of the property annexed in April 1952), most of the land is low and flat and the westerly portion is swampy. Easterly of the tracks the land slopes up to the Wasatch Mountains. The southerly portion of this low land, embracing about 1,300 acres, was disconnected by the decree of the trial court.

The easterly portion of the disconnected land, adjacent to the Town as constituted prior to April 21, 1952, is suitable for farming and industrial plants. The industrial plants of respondents are located on the easterly portion of the territory and in close proximity to the tracks of the Union Pacific and Rio Grande. The remainder of the area, extending to the Jordan River is low with high water tables and partly covered with water in late winter and early spring. This area is cut through with open and closed sewer lines, an open drainage ditch leading from the stock yards and Cudahy Packing Company area, and an oil sewer canal coming from the railroad and refining area in Salt Lake City.

The trial court found that the allegations of plaintiffs' complaint were true and that justice and equity required that the lands described in the complaint be disconnected from the Town. The Town attacks this finding.

It was alleged by plaintiffs and found by the court, in addition to the facts already mentioned herein, that the Town was organized primarily to provide residents of the area with a culinary water system, that the Town expended substantial sums for the acquisition and development of additional supplies of water. No part of said facilities were extended into the area disconnected. There are no houses on the area in-

volved. The only structures which are erected in this territory consist of the buildings and facilities of Salt Lake Refining Company, Standard Oil Company of California, Salt Lake Pipe Line Company, some of the oil storage tanks of Western States Refining Company and the powder magazines of Illinois Powder and Columbia Powder.

There are no sidewalks, curbs or gutters within the involved area. No part thereof has ever been platted or subdivided for residential development. Two principal roads traverse the area. An extension of Redwood Road, sometimes referred to as the "Industrial Highway," and identified on Exhibit 2 as State Highway U–249, extends across the area in a northerly and southerly direction. This road in maintained by the Utah State Road Commission. Near the northerly side of the area in question is an east and west road known as Cudahy Lane. This road is graveled from where it crosses the Industrial Highway to the Jordan River, east of that point it is hard surfaced; within the disconnected area Cudahy Lane is maintained entirely at the expense and with the equipment and manpower of Davis County. A secondary road known as the "St. Joseph Farm Road" extends from U. S. Highway westerly to a point where the sewer conduit of Salt Lake City is discharged into the open sewer canal.

The plaintiff Salt Lake Refining Company in 1948, at the time it constructed its refinery, constructed at its own expense a hard surfaced road leading from the public streets of Salt Lake City northerly to its plant, which road constitutes the principal public access to its premises.

No water is being furnished to any industry or person within the disconnected area. The Town has sufficient water supply to satisfy the requirements of its inhabitants outside the area involved together with some additional capacity for future growth; in the opinion of its engineer it could furnish Salt Lake Refining Company with water for culinary purposes, but could not now provide the company with water for its industrial requirements.

An adequate water supply is of utmost importance in the operation of an oil refinery. Large quantities are consumed in its operations and an adequate supply is imperative. In order to provide such a supply arrangements were made by Salt Lake Refining Company in 1948 with Salt Lake City. The Refining Company advanced to Salt Lake City funds for the construction of a main to furnish water from Salt Lake City. The Refining Company, in order to protect itself against the possibility that Salt Lake City may be unable to furnish sufficient water, has entered into firm contracts with Weber Basin Water Conservancy District for water which obligates it

to pay approximately $95,000 per year whether it uses the water or not. The Bountiful Livestock Company requires no water supply from the Town, nor do the plaintiff powder companies.

The Town has no fire fighting facilities and the Salt Lake Refining Company has provided itself fire fighting facilities through water from Salt Lake City with storage facilities, water mains and hydrants throughout its refinery. It likewise has provided itself with fire fighting equipment consisting of a fire engine, foam powder and fire hose. It also has a fire fighting crew among its employees.

Salt Lake Refining Company has 229 employees, only 2 of whom reside in the Town. Salt Lake Pipe Line Company has 48 employees, none of whom reside in the Town.

The Town has a town marshal who works one shift per day and who employs an assistant during certain periods. His duties consist primarily of the policing of traffic on U. S. Highway 91 and the protection of business establishments and dwellings of the Town east of the area in question. There is no evidence that he does any patrolling within the refinery area; in fact this area is fenced and the company maintains guards at its gates who control entrance to and exit from the refining area. The marshal makes one trip per shift along Cudahy Lane and the Industrial Road.

No garbage removal is conducted by the Town within the disconnected area. The area sought to be disconnected will not be required for the future use or growth of the Town and such disconnection will not destroy the symmetry of its boundaries. There is ample area for industrial expansion northerly of the Island area and northerly of the Town as it existed before the April 21, 1952 annexation and in the vicinity of the railroad tracks.

In its finding of fact number 16 the court found as follows:

"Upon consideration of all of the evidence in this proceeding, the Court further finds that the territory sought to be disconnected from the Town does not now and within the foreseeable future will not receive any substantial, direct and special benefit resulting from the exercise of the powers granted to the town."

The court found that the resistance of the Town to the disconnection of the territory in question stems essentially from the desire of the Town to retain within its corporate limits the property of the Salt Lake Refining Company. The court found that the evidence fails to show any close relationship between the industrial concerns within the area involved and the Town.

The disconnected area has a valuation equal to 61% of the total valuation of the Town prior to the disconnection.

A review of the evidence discloses that not only will it sustain the court's finding, but that it would have been unjust and inequitable for the court to have found otherwise.

It is most significant that it was not until the establishment of the industries in the area west of the Town that this annexation occurred. The evidence discloses that not the least important reason for the annexation was to take in the large industrial enterprises for the purpose of assuring the Town substantial tax revenues. In fact it appears to be a reasonable inference when we consider how little the Town gives to said enterprises that desire for taxes was the prime purpose for the annexation of April 21, 1952.

Judgment affirmed. Costs on appeal to respondent.

McDONOUGH, C. J., and CROCKETT and WADE, JJ., concur.

HENRIOD, Justice.

I concur in the result but do not share the inference of the main opinion in this case that the annexation of the disconnected area was simply to create a source of revenue. To so imply suggests that if the disconnected area *were* included within the town, the town officials would not furnish services such as fire and police protection, water, sanitation and the like, which in turn suggests that such officials are acting in bad faith. For aught we know the very reason why all of the services mentioned in the main opinion are not readily available is because of the lack of assurance that the town would receive the revenues that the subject area would produce were it certain it would be annexed to the town. If a new territory can demand the services of a community before it is charged with a duty to help support it, annexation would be difficult or impossible.

I concur in the result only because I believe there is evidence to sustain the trial court as far as the present and foreseeable future is concerned. I could not subscribe to any theory that would make our present decision binding on the future. I think the question of annexation of this territory is a fluctuating one. If drainage, habitation, construction and many other factors call for changed scenery on a quickly changing stage, this decision should be no deterrent to annexation if and when it can be shown that it is only fair that the territory share in the burdens of a growing community in whose midst or close proximity it finds itself.