2007 UT 57

**BLUFFDALE MOUNTAIN HOMES, LC, and South Farm LLC, Plaintiffs and Appellees,**

v.

**BLUFFDALE CITY, Defendant and Appellant.**

No. 20060295.

Supreme Court of Utah.

July 20, 2007.

Bruce R. Baird, Walter T. Keane, Salt Lake City, for Bluffdale Mountain Homes.

Hollis S. Hunt, Draper, for South Farm.

Douglas J. Parry, Todd D. Weiler, Craig R. Kleinman, Salt Lake City, for Bluffdale City.

DURRANT, Justice:

## INTRODUCTION

¶ 1 Several property owners, including the plaintiffs in this case, filed a request for disconnection with Bluffdale City ("Bluffdale" or "the City"). Bluffdale denied this request, and thereafter the property owners filed a disconnection petition with the Third District Court. After a four-day trial, the district court determined that the property owners had met their burden of proving the statutory requirements for disconnection. Bluffdale now appeals this decision.

¶ 2 Upon review of the district court's factual findings and legal conclusions, we affirm the district court's decision granting the disconnection.

## BACKGROUND

¶ 3 This disconnection dispute involves a long and complex factual and procedural history. We note that the district court's opinion in this case was particularly thorough and well reasoned; therefore, we incorporate herein, largely verbatim, those facts from the district court's recitation of the facts that are most relevant to our disposition of the case.

### I. HISTORY OF THE DISPUTE

¶ 4 In the 1980s, the entity now known as South Farm LLC ("South Farm") purchased a large, contiguous tract of property for investment and development; one-half of the property was located in unincorporated Salt Lake County ("the County") and one-half was located in Bluffdale City. South Farm originally sought to have this entire property annexed into Riverton City so that it could be developed as a consistent whole. But Bluffdale objected and ultimately denied the annexation.

¶ 5 South Farm applied to the County to begin development of the unincorporated portion of its property located outside of Bluffdale. This process included public meetings with neighboring communities. In August 1999, over Bluffdale's objections, the County approved a general plan of development for the property. The property was ultimately incorporated into the City of Herriman, however. Since then, the property has been largely developed and is currently known as "Rosecrest," which includes approximately eighteen subdivisions and two thousand residential units. By all accounts, the Rosecrest development has been an attractive and successful mixed-use development, representing high standards of land-use planning.

¶ 6 The Bluffdale portion of the South Farm property has not proceeded as smoothly toward development. In October 1997, Don Wallace, a managing member of South

Farm, appeared at a public meeting to answer questions regarding South Farm's plans for its property in Bluffdale. South Farm desired a similar mixed-use development to the one it had established in neighboring Rosecrest. Bluffdale had long sought, however, to limit residential and mixed-use density, preferring lot sizes of one to five acres for residential homes. Indeed, many Bluffdale citizens opposed South Farm's plans, both during and after the meeting, and up until May 2002, Bluffdale officials dissuaded South Farm from presenting any development plans with respect to its property.

¶ 7 Nevertheless, Bluffdale also recognized the need for long-range planning, given the inevitable development pressure it would face from the growth in the southern area of the County. Bluffdale prepared capital improvement plans, transportation plans, water plans, drainage plans, and other plans to establish the future look of the City. Bluffdale desired to have its future planning in order before it invested the necessary resources to consider a project of the scale intended by South Farm.

¶ 8 Given Bluffdale's limited resources, the planning process was time consuming. From South Farm's perspective, progress was excruciatingly slow. Indeed, many of Bluffdale's plans remained either unfinished or unadopted up to the time of trial. Bluffdale persuaded South Farm to hold off on filing any applications for an amendment to the City's General Plan that would allow development of the property. Bluffdale was working toward completion of its planning process; however, there were clearly elements within the City that were hostile to Rosecrest-like developments. The district court made note of "the reasonable inference that some foot-dragging was taking place—whether intentionally or as a result of the natural human tendency to defer consideration of issues that are likely to be contentious."

¶ 9 During this slow planning process, Bluffdale encouraged South Farm to produce a Quality Growth Plan. In preparing this plan, South Farm held numerous public meetings with representatives of the City and other stakeholders. In September 2001, South Farm produced a draft of a Quality

Growth Plan, and although never formally adopted by Bluffdale, it gave South Farm hope that a Rosecrest-like development was within reach. For example, the Quality Growth Plan approved recommended densities as high as 2.5 residences per acre throughout the South Farm property, provided that a thirty-five percent open space requirement was met. But the Quality Growth Plan was by no means an unequivocal endorsement of a Rosecrest-like development; the plan acknowledged Bluffdale's commitment to a "rural-like atmosphere" and a strong preference for developments with minimum lot sizes of one acre.

¶ 10 In the fall of 2001, Shane Jones, the City's engineer, approached Wallace for an easement across South Farm's property for a twelve-foot water line needed to service newly developed portions of the City. Before those discussions were complete, a contractor hired by the City trespassed on South Farm's property to begin work on the water line. Bluffdale urgently needed the water line to address water pressure and fire protection issues in Gardner Estates and other new developments in the northern section of the City. In order to obtain the needed easement and resolve the trespass issue, Bluffdale and South Farm discussed a trade of the easement for the adoption of planning policies that would allow South Farm to develop its property consistent with the existing Rosecrest development. In the context of those discussions, during a Bluffdale City Council meeting, Greg Curtis, the City's attorney, advised the City Council that if they were not comfortable with the mixed-use Rosecrest development in Herriman, they should not vote for the proposed resolution. Furthermore, Curtis stated that if the City did not provide infrastructure for new development, property owners could make a compelling argument to disconnect.

¶ 11 On January 8, 2002, the Bluffdale City Council unanimously approved Resolution No.2002–05, which resolved the easement issue and provided the following statement of good faith:

> [South Farm] has agreed to provide the requested easement without cost to the City, but in turn has requested a declara-

tion of intent from the City as to the general acceptability of [South Farm's] future development of [its] real property which lies in the City. [South Farm] is in the process of completing an existing master planned project, a mixed-use real estate development in the town of Herriman which is contiguous and immediately adjacent to [its] real property located in the City and is desirous to continue the development of its Bluffdale property with similar mixed uses, density, and transportation elements as existed in its existing master planned project in Herriman.

(b) Subject to the express continued administration of its legislative and regulatory authority over development of the [South Farm] real property and without waiving any of its future regulatory authority, the City declares its intent regarding the development of the [South Farm] property as follows:

(1) That the best use of the [South Farm] property in the City is to develop the [South Farm] property with a mixture of uses, density, commercial, recreational, transportation and open space elements compatible with the Rosecrest property in the town of Herriman that is adjacent and contiguous to the [South Farm] property in the City of Bluffdale.

¶ 12 On December 21, 2001, before this resolution passed, Bruce Parker, the City's planner, wrote to Wallace to again dissuade South Farm from proposing a General Plan Amendment until the City's internal planning was complete. In essence, the letter provided two options: (1) wait until the City is ready or (2) propose a development consistent with the current zoning scheme. South Farm waited an additional six months and observed no significant progress toward completion of Bluffdale's internal planning.

¶ 13 On May 6, 2002, South Farm formally submitted its General Plan Amendment. The amendment was patterned on the principles of the Quality Growth Plan—although clearly beyond the letter of that plan—and consistent with the principles recognized by the City in the adoption of Resolution 2002–05. Bluffdale began immediate consideration of the amendment through its planning staff.

Once again, because of the size of the project and the limited resources of the City, progress was slow.

¶ 14 On November 12, 2002, Bluffdale adopted a series of land use planning principles for Planning District No. 4, which included the same area as South Farm's property. Those principles included the following:

Planning District No. 4 should generally provide opportunities for low density residential uses, with residential density of one (1) dwelling unit to one (1) acre and one (1) dwelling unit per five (5) acres being provided.

*Only in those areas located immediately adjacent to an existing and neighboring municipality,* and only in order to recognize adjacent land uses and to provide the desired land use transitioning and compatibility, shall commercial, professional office, public uses and residential uses with densities greater than recommended by Policy No. 1 be considered by the City

(emphasis added).

¶ 15 The meaning of "immediately adjacent" became an important area of contention. If that phrase was read narrowly to include only the narrow strip bordering on the existing Rosecrest development, it was significantly more restrictive than the recommendations of the Quality Growth Plan and a repudiation of Resolution 2002–05. On the other hand, if the entire South Farm property was considered "immediately adjacent," a Rosecrest-like development was still possible in Bluffdale.

¶ 16 The following year, South Farm and Bluffdale discussed the General Plan Amendment during dozens, if not hundreds, of meetings, without any discernible progress toward amending the City's General Plan. Because of this apparent lack of progress, South Farm proposed outsourcing review of the General Plan Amendment. Bluffdale accepted this proposal and hired J–U–B Engineers, Inc. ("J–U–B") and Tischler & Associates, Inc. ("Tischler") to act as the City's consultants in reviewing the amendment. South Farm agreed to advance the cost of their work. The consultants completed their

report on or about July 7, 2003. Dozens of meetings were held to address the concerns raised in the J–U–B/Tischler report.

¶ 17 By the time the General Plan Amendment was ready for consideration by the Bluffdale City Council, South Farm had invested almost one million dollars and thousands of hours in the planning process. On December 9, 2003, the City Council finally considered the General Plan Amendment. The City's planning commission recommended adoption of the amendment. The consultants, J–U–B and Tischler, also recommended adoption of the amendment. But the City Council voted to reject the General Plan Amendment based upon a narrow reading of the planning principles that had been adopted for Planning District No. 4.

¶ 18 Many property owners in the area proposed for disconnection wanted to develop their property in a manner comparable to that of South Farm and had watched or participated with interest in Bluffdale's planning and development process. On February 12, 2004, fifty-two property owners, including South Farm, petitioned Bluffdale City to voluntarily adjust its boundary with the City of Herriman in order to move the disconnection property from Bluffdale to Herriman or, in the alternative, requested to disconnect the entire property from the City. The City rejected both requests. Thereafter, two of the property owners, Bluffdale Mountain Homes LC [1] and South Farm ("the Developers"), filed a petition in the Third District Court, seeking disconnection of the property pursuant to Utah Code section 10–2–502.5.

¶ 19 Notably, throughout 2005 and during discovery leading up to trial, the property owners and Bluffdale attempted to resolve their differences and come up with a land use plan that would satisfy both parties. On May 24, 2005, the Bluffdale City Council approved a Memorandum of Understanding that set a framework for development of the disconnection property. On August 23, 2005,

the City Council approved a Special Development Plan District Ordinance that was a necessary prerequisite to implementing the Memorandum of Understanding and would create a special development zone. But Bluffdale citizens opposing the development applied for a referendum to overturn the City Council's decision to create the special development zone. [2] In order to avoid the delay that would be caused by the referendum, the property owners and Bluffdale worked out a development plan agreement that would be implemented by a Consent Decree. The City Council approved the proposed Consent Decree, but once again Bluffdale citizens applied for a referendum to overturn the City Council's approval. On November 10, 2005, the district court rejected the proposed Consent Decree, viewing the decree as a political remedy outside the scope of the pleadings and its review of the grounds for disconnection.

## II. DESCRIPTION OF THE DISCONNECTION AREA

¶ 20 The area proposed to be disconnected ("the Disconnection Area") is a triangle-shaped parcel of approximately 3,971 acres in the southwest corner of Bluffdale City. The Disconnection Area is bounded by Bluffdale on the east, Riverton on the north, Herriman on the west, and Camp Williams on the south. [3] The total acreage represents approximately thirty-eight percent of Bluffdale's land area. The Disconnection Area is almost completely undeveloped. With the exception of some water conservancy district facilities on the eastern border of the property and one dwelling, there are no structures on the property.

¶ 21 The Disconnection Area is separated from the rest of Bluffdale City by a substantial manmade barrier, a thirty-five-foot-wide canal known as the "Welby/Jacobs Canal."

1. At trial, South Hills Development LLC claimed to be the successor in interest to Bluffdale Mountain Homes. We refer to Bluffdale Mountain Homes herein because that name was used in the proceedings below and on appeal.

2. We note that on June 27, 2006, the City Council passed Resolution 2006–28, certifying the referendum results, which were in favor of the City's special development zone.

3. Camp Williams is not a municipality, but a military installation.

The easement associated with the canal is wider than the canal itself. The canal forms the eastern border of the Disconnection Area for the majority of its length. The balance of the eastern border is Redwood Road.[4] There are no public roads within the Disconnection Area, and no public bridges cross the Welby/Jacobs Canal.

¶ 22 The only Bluffdale-owned facilities that exist within the Disconnection Area are a twelve-inch water pipe and associated meters and pressure reduction facilities that run parallel to the Welby/Jacobs Canal. The water line does not currently serve the Disconnection Area, but was installed primarily to provide additional water pressure and fire protection for Gardner Estates and other new developments in the northern section of the City east of the Welby/Jacobs Canal. Although this water line has some additional capacity that could be directed toward the Disconnection Area, serving this property was not the primary motivation for its installation.

¶ 23 Bluffdale City has provided the Disconnection Area with minimal police and fire protection services. There is evidence that the police have made calls to the property approximately twice a year to investigate trespass or other minor criminal conduct, and there have been seven to eight fire calls per year.

## III. THE DISTRICT COURT'S DISCONNECTION DECISION

¶ 24 Before the district court, Bluffdale moved to dismiss the Developers' disconnection petition, arguing, among other things, that the petition was facially defective because less than fifty percent of the owners of real property within the Disconnection Area filed the petition with the court and therefore the court lacked subject matter jurisdiction. The district court dismissed the Developers' initial petition but granted them

thirty days' leave to file an amended petition containing the names of more than fifty percent of the real property owners. The Developers promptly filed an amended petition with the names of more than fifty percent of the real property owners. Bluffdale sought permission to file an interlocutory appeal of the court's jurisdictional ruling on this matter, but the court of appeals denied such permission.[5]

¶ 25 After a four-day bench trial, the district court held that the petitioners had "met their burden of proving the statutory prerequisites to disconnection" and granted their disconnection petition. Bluffdale now appeals this decision, and we have jurisdiction pursuant to Utah Code section 78–2–2(3)(j).

## ANALYSIS

¶ 26 As a general matter, we review the district court's decision for correctness. But some determinations under the disconnection statute are questions of fact or mixed questions of fact and law subject to substantial deference. We review them accordingly.

¶ 27 Our review of the disconnection statute, the district court's decision, and the record in this case leads us to affirm the court's findings of fact and conclusions of law as follows: (1) The district court had subject matter jurisdiction over the disconnection petition, (2) the disconnection is viable, (3) the disconnection will not materially increase the cost of Bluffdale's municipal services, (4) the disconnection will not make it unfeasible for Bluffdale to function as a municipality, (5) justice and equity require the disconnection, (6) the disconnection does not leave or create a prohibited peninsula, and (7) disconnection is an appropriate remedy. We will discuss each of these issues in turn.

## I. THE DISTRICT COURT HAD SUBJECT MATTER JURISDICTION

¶ 28 "Petitioners," as defined by statute, must file a disconnection petition with

---

4. The district court incorrectly stated that the Welby/Jacobs Canal and Redwood Road formed the "western border" of the Disconnection Area.

5. When an appellate court declines to address subject matter jurisdiction in an interlocutory

appeal, the parties may appeal a decision as to subject matter jurisdiction once a final judgment is entered. *See Houghton v. Dep't of Health,* 2005 UT 63, ¶ 16, 125 P.3d 860.

the district court for the court to have subject matter jurisdiction to review the petition.[6] Once jurisdiction is thereby obtained, the district court has discretion to allow an amendment of the petition to satisfy other statutory requirements.

*A. Bluffdale Mountain Homes and South Farm Qualified as "Petitioners" Under the Disconnection Statute*

 ¶ 29 The district court had subject matter jurisdiction by virtue of the filing of a petition with the court by Bluffdale Mountain Homes and South Farm challenging Bluffdale City's decision to deny disconnection. Thus, the district court acted well within its discretion in allowing an amendment of the petition. Furthermore, even if we assume that the district court erred in allowing an amendment rather than dismissing the petition without prejudice, the error was harmless. The Developers could have simply filed another petition with the court meeting all of the proper statutory requirements.

 ¶ 30 The disconnection statute at issue, comprising Utah Code sections 10–2–501 to –510, has been extensively modified since we last reviewed a disconnection case;[7] thus, our review of the statute as presently constituted is one of first impression. "Our objective in interpreting a statute is to effectuate legislative intent, and that intent is most readily ascertainable by looking to the plain language of the statute."[8] In doing so, "[w]e read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter or related chapters."[9]

¶ 31 Utah Code section 10–2–501(2) provides as follows:

(a) Petitioners proposing to disconnect an area within and lying on the borders of a municipality shall file with that municipality's legislative body a request for disconnection.

(b) Each request for disconnection shall:

(i) contain the names, addresses, and signatures of the owners of more than 50% of the real property in the area proposed for disconnection;

(ii) give the reasons for the proposed disconnection;

(iii) include a map or plat of the territory proposed for disconnection; and

(iv) designate between one and five persons with authority to act on the petitioners' behalf in the proceedings.

Both parties agree that these initial requirements were met. The request for disconnection filed with Bluffdale City (1) contained the names, addresses, and signatures of fifty-two property owners who owned more than fifty percent of the real property in the area proposed for disconnection; (2) gave the reasons for the proposed disconnection; (3) included a map or plat of the territory proposed for disconnection; and (4) designated three individuals with authority to act on the property owners' behalf in the proceedings.

¶ 32 The statute further provides that when a municipality denies a request for disconnection, "petitioners" may file a petition with the district court challenging the municipality's decision. Section 10–2–502.5(5) states as follows:

(a) A petition against the municipality challenging the municipal legislative body's determination under Subsection (4) may be filed in district court by:

(i) *petitioners;* or

(ii) the county in which the area proposed for disconnection is located.

(b) Each petition under Subsection (5)(a) shall include a copy of the request for disconnection.[10]

¶ 33 Bluffdale argues that the "petitioners" filing a petition with the district court must be all of the same "petitioners" that filed a request for disconnection with the municipali-

---

**6.** Utah Code Ann. § 10–2–502.5(5) (2003).

**7.** *See South Jordan City v. Sandy City,* 870 P.2d 273 (Utah 1994).

**8.** *State v. Carreno,* 2006 UT 59, ¶ 11, 144 P.3d 1152.

**9.** *Bd. of Educ. v. Sandy City Corp.,* 2004 UT 37, ¶ 9, 94 P.3d 234 (internal quotation marks omitted).

**10.** Utah Code Ann. § 10–2–502.5(5) (emphasis added).

ty and that these petitioners must consist of more than fifty percent of the real property owners in the Disconnection Area. The petitioners in the action filed with the district court consisted of only two property owners out of the original fifty-two that brought the request for disconnection, and those two owned only thirty-one percent of the Disconnection Area. The district court agreed with this interpretation of the statute and dismissed the Developers' initial petition, granting thirty days' leave to file an amended petition containing the names of more than fifty percent of the real property owners. We hold that the district court erred in imposing the requirement that all of the same petitioners that filed a request for disconnection with the municipality must also file the disconnection petition with the district court.

■ ¶ 34 Section 10–2–501(1) defines "petitioners" as follows:

As used in this part "petitioners" means persons who:

(a) own title to real property within the area proposed for disconnection; and

(b) have signed a request for disconnection proposing to disconnect that area from the municipality.

Thus, according to the disconnection statute, "petitioners" are persons who own title within the area proposed for disconnection *and* have signed a request for disconnection with the municipality. Section 10–2–502.5(5)(a)(i) states that such "petitioners" may file a petition before the district court. Accordingly, a petition in district court may be filed by "petitioners" who (1) own title to real property within the area proposed for disconnection and (2) have signed a request for disconnection with the municipality. Both Bluffdale Mountain Homes and South Farm clearly qualify as "petitioners" under this definition and therefore properly filed a petition with the district court.

¶ 35 Significantly, the disconnection statute does not say that *all* of the petitioners who filed the request for disconnection with the municipality must also file the subsequent petition with the district court. Moreover, although the statute requires the fifty percent threshold as to a request for disconnection with the municipality, it makes no reference to such a threshold in order to file a petition with the district court. Those who file with the district court must simply qualify as "petitioners" as that term is defined in the statute. Accordingly, the district court had subject matter jurisdiction because Bluffdale Mountain Homes and South Farm owned title to real property within the area proposed for disconnection and had signed a request for disconnection with the municipality.

**B. Our Precedent Is Not Inconsistent with the Conclusion that the District Court Had Subject Matter Jurisdiction**

■ ¶ 36 Under a prior statutory scheme, we held in a few cases that when a disconnection or withdrawal petition is facially insufficient, the district court lacks subject matter jurisdiction and has no choice but to dismiss the petition without prejudice.[11] In these cases, we stated that a petition must be signed and filed by the required majority or be dismissed; otherwise, permitting parties to make amendments to a petition would frustrate issues of notice and leave uncertain whether the court had jurisdiction. Bluffdale argues that, under this precedent, the district court lacked jurisdiction and was required to dismiss the Developers' petition without prejudice because it was not signed and filed by a majority of real property owners in the Disconnection Area and therefore the court erred when it granted the Developers leave to amend their petition. We disagree.

¶ 37 While Bluffdale argues that *Howard v. Town of North Salt Lake, South Jordan v. Sandy City,* and *Mariemont Corp. v. White City Water Improvement District* govern the jurisdictional issue before us now, it fails to take into account that the current version of the disconnection statute has been extensively modified since we decided those cases, most significantly with respect to the role of

---

11. *See S. Jordan City v. Sandy City,* 870 P.2d 273, 275 (Utah 1994); *Howard v. Town of North Salt Lake,* 3 Utah 2d 189, 281 P.2d 216, 220 (1955); *see also Mariemont Corp. v. White City Water Improvement Dist.,* 958 P.2d 222, 227 (Utah 1998).

the district court and the manner in which notice is given. Furthermore, our *Mariemont* decision considers a water district withdrawal statute that is not before us now.[12]

¶ 38 In *Howard*, the petitioners filed a request for disconnection with the district court that "was not signed by the required majority of real property owners."[13] On the day of the hearing, several property owners filed motions with the court to intervene and add their names to the request for disconnection.[14] The district court allowed the property owners to intervene, thus providing the request for disconnection with the requisite majority of real property owners.[15]

¶ 39 We overturned the district court's decision and held that the request for disconnection must be initially signed and filed by a majority of real property owners.[16] We stated that this was a statutory prerequisite for the court to have subject matter jurisdiction over the petition and that because the request for disconnection was not signed and filed by a majority of real property owners, the district court had no jurisdiction and no choice but to dismiss the petition without prejudice.[17] We reasoned that the Legislature included this majority requirement for purposes of notice—the need for residents to know "who is seeking to divide the town and ... to know what counter-measures may be taken to preserve it intact."[18] If the court allowed property owners to add their names after the petition had been filed, the prerequisite and notice requirement that it intended to serve would each be rendered meaningless.[19]

¶ 40 In *South Jordan*, while reviewing a different version of the statute than in *Howard*, we held that a request for disconnection must be signed and filed by a majority of registered voters in the proposed disconnection area.[20] We affirmed the district court's dismissal of the petition, noting that the petition was "facially defective."[21]

¶ 41 In *Mariemont*, we followed *Howard's* reasoning by analogy, holding that, under the water district withdrawal statute,[22] a petition requesting withdrawal from a special improvement district is insufficient without the signatures of a "majority of real property owners" and therefore does not confer jurisdiction upon the court.[23] We noted that after such a petition is filed, signatures can be neither added to nor subtracted from the petition.[24] Further, we stated that forbidding amendments to a petition is justified because courts need to have a clear idea who is a party to a pending action.[25] "To permit the parties to make amendments would be to invite confusion as to who is a party to the withdrawal proceeding and whether the district court is still vested with jurisdiction at any given time."[26]

¶ 42 As we noted above, in *Mariemont* we did not consider the disconnection statute that is before us now. Furthermore, in *Howard* and *South Jordan*, the then-applicable statutory scheme for disconnection required the petitioners to first file a request for disconnection with the district court, completely bypassing independent review by the municipality.[27] Under this scheme, the district court served notice of the filing upon the

12. 958 P.2d at 223.

13. *Howard*, 281 P.2d at 217.

14. *Id.*

15. *Id.*

16. *Id.* at 220.

17. *Id.* at 219–20.

18. *Id.*

19. *Id.*

20. 870 P.2d 273, 275 (Utah 1994).

21. *Id.*

22. *See* Utah Code Ann. §§ 17A–2–334 to –335 (1991) (repealed 2002). Withdrawal requirements are now located in Utah Code sections 17B–2–601 to –611 (2004).

23. 958 P.2d 222, 226–27 (Utah 1998).

24. *Id.* at 227.

25. *Id.*

26. *Id.*

27. *See* Utah Code Ann. § 10–4–1 (1953) (current version at *id.* § 10–2–501); *id.* § 10–2–501 (1986) (current version at *id.* § 10–2–501).

municipality and published the petitioners' disconnection request.[28] The district court also determined whether the petition was signed by the required majority of real property owners,[29] whether the allegations in the petition were true, and whether justice and equity required the disconnection.[30] Finally, under the former scheme, the district court appointed commissioners to determine the ultimate terms of the disconnection.[31]

¶ 43 In contrast, the current version of the statute requires that petitioners first file a request for disconnection with the municipality, which is then responsible for determining whether the petition includes the requisite number of real property owners.[32] And the petitioners, rather than the district court, are subject to significant notice and public hearing requirements designed to ensure that residents and other interested parties are aware of the potential disconnection and have the opportunity to comment before the municipality's legislative body.[33] Under the current statute, parties may file a petition with the district court only when a municipality denies a request for disconnection.[34] At that stage, notice requirements have already been fulfilled at the municipality level and interested parties have been given a fair opportunity to address the disconnection. The district court reviews the municipality's decision and is primarily concerned with whether the disconnection is viable, whether justice and equity require the disconnection, and whether the disconnection will result in various burdens on the municipality or the county.[35] And as we have discussed previously, jurisdiction is conferred on the district court only when "petitioners," defined as those who own real property with-

in the disconnection area and have already filed a request for disconnection with the municipality, file a petition with the court.[36] Of course, the district court may still review the required copy of the request for disconnection, which must contain the names, addresses, and signatures of more than fifty percent of the real property owners in the disconnection area,[37] in order to ensure that previous statutory requirements were met.

¶ 44 Ultimately, the current statutory scheme contemplates different roles for both the district court and the municipality than did the statutory scheme considered in our prior cases. The concerns that we had as to notice and potential confusion that drove our prior decisions are no longer relevant under the current statutory scheme. Moreover, even if we assume that the district court erred in allowing an amendment to the petition, the error was harmless. The Developers simply could have filed another petition with the district court meeting the statutory requirements.

## II. REVIEW OF THE DISTRICT COURT'S FACTUAL FINDINGS AND LEGAL CONCLUSIONS

¶ 45 Under the disconnection statute, the district court must determine whether the disconnection is viable, whether justice and equity require the disconnection, and whether the disconnection will result in various burdens on the municipality or county. Utah Code section 10–2–502.7 provides as follows:

(1) After the filing of a petition under Section 10–2–502.5 and a response to the petition, the court shall, upon request of a

---

28. *See id.* § 10–4–1 (1953) (current version at *id.* § 10–2–501(3)); *id.* § 10–2–501(3) (1986) (current version at *id.* § 10–2–501(3)).

29. The version of the statute at issue in *South Jordan* required a majority of registered voters to sign and file the petition. *See id.* § 10–2–502 (1986) (current version at *id.* § 10–2–501(2)(b)(i)).

30. *See id.* § 10–4–2 (1953) (current version at *id.* § 10–2–502.7(3)(b)); *id.* § 10–2–502 (1986) (current version at *id.* § 10–2–502.7(3)(b)).

31. *See id.* § 10–4–2 (1953) (current version at *id.* § 10–2–507); *id.* § 10–2–502 (1986) (current version at *id.* § 10–2–507).

32. *See id.* § 10–2–501(2) (2003).

33. *See id.* § 10–2–501(3).

34. *See id.* § 10–2–502.5(5)(a).

35. *See id.* § 10–2–502.7.

36. *See id.* §§ 10–2–501(1), 10–2–502.5(5)(a).

37. *See id.* § 10–2–502.5(5)(b).

party or upon its own motion, conduct a court hearing.

(2) At the hearing, the court shall hear evidence regarding the viability of the disconnection proposal.

(3) The burden of proof is on petitioners who must prove, by a preponderance of the evidence:

(a) the viability of the disconnection;

(b) that justice and equity require that the territory be disconnected from the municipality;

(c) that the proposed disconnection will not:

(i) leave the municipality with an area within its boundaries for which the cost, requirements, or other burdens of providing municipal services would materially increase over previous years;

(ii) make it economically or practically unfeasible for the municipality to continue to function as a municipality; or

(iii) leave or create one or more islands or peninsulas of unincorporated territory; and

(d) that the county in which the area proposed for disconnection is located is capable, in a cost-effective manner and without materially increasing the county's costs of providing municipal services, of providing to the area the services that the municipality will no longer provide to the area due to the disconnection.

(4) In determining whether petitioners have met their burden of proof with respect to Subsections (3)(c)(i) and (ii), the court shall consider all relevant factors, including the effect of the proposed disconnection on:

(a) the municipality or community as a whole;

(b) adjoining property owners;

(c) existing or projected streets or public ways;

(d) water mains and water services;

(e) sewer mains and sewer services;

(f) law enforcement;

(g) zoning; and

(h) other municipal services.

(5) The court's order either ordering or rejecting disconnection shall be in writing with findings and reasons.[38]

We now review the district court's decision with respect to the pertinent factual findings and legal conclusions required under the disconnection statute.

### A. The District Court's Finding that the Disconnection Is Viable Is Not Clearly Erroneous

 ¶ 46 Under the disconnection statute, the petitioners must prove by a preponderance of the evidence "the viability of the disconnection."[39] A determination of viability is a question of fact; therefore, we grant broad deference to the district court's factual findings and will not reverse those findings unless clearly erroneous.[40]

 ¶ 47 The district court found that the disconnection was viable "whether the property remains undeveloped or is annexed into Herriman and developed into a Rosecrest-like project." Viewing the Disconnection Area as undeveloped land within the County, the court found that the cost of providing services will not change immediately following the disconnection. Additionally, the court found that the tax revenue generated from the land will more than double and the land is therefore more viable in the County than in Bluffdale.

¶ 48 The district court noted that whether the Disconnection Area will remain viable once it is developed presented a more complicated question. The parties agreed that annexation into Herriman is inevitable and also agreed that residential development, considered in isolation, is a net financial loss to a municipality. But the court found that this loss would be more than offset through sales taxes.

¶ 49 Bluffdale argues that the court's factual finding is clearly erroneous. Yet Bluff-

---

**38.** Utah Code Ann. § 10–2–502.7 (2003).

**39.** *Id.* § 10–2–502.7(3)(a).

**40.** *State v. Daniels,* 2002 UT 2, ¶ 18, 40 P.3d 611.

dale fails to show that the court's finding is unsupported by a preponderance of the evidence, let alone that the court's finding is clearly erroneous. Bluffdale argues that when the Disconnection Area is annexed, Herriman's cost of providing services will dramatically increase and Herriman will not be able to service the property without using development fees. The district court found, however, that although a residential development, considered in isolation, is a net financial loss for a municipality, the increase in population, together with planned and existing commercial and retail elements, will provide more than offsetting revenues through sales taxes. Bluffdale provides little evidence to rebut this finding by the court; therefore, we cannot say that the court's finding is clearly erroneous. Accordingly, we affirm the district court's finding as to the viability of the disconnection.

B. *Bluffdale Fails To Adequately Challenge the District Court's Factual Finding that the Disconnection Will Not Materially Increase the Cost to Bluffdale of Providing Municipal Services*

¶ 50 Under the disconnection statute, the petitioners must prove by a preponderance of the evidence "that the proposed disconnection will not ... leave the municipality with an area within its boundaries for which the cost, requirements, or other burdens of providing municipal services would materially increase over previous years."[41] This is a question of fact, which we will not reverse unless clearly erroneous.[42]

¶ 51 The district court found that the disconnection will not materially increase Bluffdale's cost of providing municipal services. In making this finding, the district court viewed the Disconnection Area as both raw and developed land. Specifically, the court found that the cost to Bluffdale of providing municipal services will not materially increase because (1) the disconnection would not result in a significant increase in traffic in Bluffdale, (2) the disconnection

would not result in an increase in surface run-off in Bluffdale, and (3) the disconnection would not result in an increase in law enforcement, zoning, and other municipal services in Bluffdale. The court noted in its order that although both parties' witnesses agreed that traffic would increase on the streets of Bluffdale, the petitioners' traffic analyst, Steve Goeres, specifically testified that the increase would be only 2.5 percent and that Bluffdale had offered only unsupported testimony in rebuttal of this testimony. Further, the district court noted, as to an increase in surface run-off, even Bluffdale's witness conceded that run-off would be more efficiently channeled and controlled with development.

¶ 52 In challenging the court's finding that the disconnection will not materially increase Bluffdale's cost of providing municipal services, Bluffdale has failed to adequately marshal the evidence. As we have stated many times before,

> [W]hen appealing a highly fact dependent issue, the appellant has a duty to marshal the evidence. This duty requires an appellant to marshal all of the facts used to support the trial court's finding and then show that these facts cannot possibly support the conclusion reached by the trial court, even when viewed in the light most favorable to the appellee. An appellant may not simply cite to the evidence which supports his or her position and hope to prevail. Furthermore, failing to properly marshal is sufficient ground for affirming the trial court's finding.[43]

Accordingly, we reject Bluffdale's challenge to the factual finding.

C. *The District Court's Finding that the Disconnection Will Not Make It Unfeasible for Bluffdale to Function as a Municipality Is Not Clearly Erroneous*

¶ 53 Under the disconnection statute, the petitioners must prove by a preponderance of the evidence "that the proposed disconnection will not ... make it eco-

---

41. Utah Code Ann. § 10-2-502.7(3)(c)(i).

42. *Daniels*, 2002 UT 2, ¶ 18, 40 P.3d 611.

43. *See Wayment v. Howard*, 2006 UT 56, ¶ 9, 144 P.3d 1147.

nomically or practically unfeasible for the municipality to continue to function as a municipality." [44] This is also a question of fact, which we will not reverse unless clearly erroneous.[45]

¶ 54 The district court found that the disconnection will not make it economically or practically unfeasible for Bluffdale to continue as a municipality. The district court found that "the loss of tax revenue is insignificant; there would be no material impact from the proposed development; and Bluffdale City's proposed growth plan for the subject property would be impractical." This does not appear to be a point of dispute between the parties. Clearly, Bluffdale would continue to function as a municipality even if the disconnection is granted.

### D. The District Court Acted Within Its Discretion in Determining that "Justice and Equity" Require the Disconnection

¶ 55 Under the disconnection statute, the petitioners must prove by a preponderance of the evidence "that justice and equity require that the territory be disconnected from the municipality." [46] Again, we note that the disconnection statute has been extensively changed and modified over the years, and therefore we consider the "justice and equity" standard in the context of the current statute and standard of review.

### 1. Appropriate Standard of Review for "Justice and Equity" Determination

¶ 56 Whether "justice and equity" require disconnection is a mixed question of fact and law, so the appropriate standard of

review is dictated by the test that we set out in *State v. Pena*,[47] and recently modified in *State v. Levin*.[48] All of our prior cases applying the "justice and equity" standard were decided before *Pena*, and they treat "justice and equity" as essentially equivalent to a factual determination and apply the clearly erroneous standard of review.[49] But as we explained in *Levin*, for mixed questions, we "select [ ] a standard of review from along a spectrum of deference that runs from highly deferential review under a 'clearly erroneous' standard on one end to completely nondeferential review under a 'correctness' standard on the other end." [50]

¶ 57 The appropriate standard of review is related to the relative institutional competencies of the trial and appellate courts. We stated in *Levin* as follows:

Because a trial court is in a better position to judg[e] credibility and resolv[e] evidentiary conflicts, an appellate court reviews the trial court's findings of fact for clear error. Conversely, an appellate court reviews a trial court's conclusions of law for correctness because a single trial judge is in an inferior position to determine what the legal content of [a legal concept] should be [whereas] a panel of appellate judges, with their collective experience and their broader perspective, is better suited to that task.[51]

We therefore consider the following three factors to determine the appropriate standard of review:

(1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a trial

---

44. Utah Code Ann. § 10–2–502.7(3)(c)(ii).

45. *Daniels*, 2002 UT 2, ¶ 18, 40 P.3d 611.

46. Utah Code Ann. § 10–2–502.7(3)(b).

47. 869 P.2d 932 (Utah 1994).

48. 2006 UT 50, 144 P.3d 1096.

49. *See In re Disconnection of Certain Territory from Highland City*, 668 P.2d 544, 546 (Utah 1983) ("The determination of what constitutes 'justice and equity' turns on the facts of each individual case. Once the district court has ruled on a petition for disconnection, its findings

will not be disturbed unless clearly erroneous."); *Continental Bank & Trust Co. v. Farmington City*, 599 P.2d 1242, 1247 (Utah 1979) ("The owners urge that, this being a matter in equity, this Court should undertake an independent evaluation of the findings of the trial court. We are, as in the past, unwilling to pursue so radical an approach. Where a trial court has ruled on the justice and equity of disconnection of an area from a city, this Court will not disturb the findings unless they are clearly erroneous.").

50. *Levin*, 2006 UT 50, ¶ 19, 144 P.3d 1096.

51. *Id.* ¶ 20 (internal quotation marks and citations omitted) (alterations in original).

court's application of the legal rule relies on "facts" observed by the trial judge ... relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts; and (3) other policy reasons that weigh for or against granting discretion to trial courts.[52]

¶ 58 Applying these factors to the "justice and equity" determination, it is clear from our prior decisions that the facts implicating "justice and equity" can be varied and complex and involve a fact-specific balancing of interests. These factors weigh in favor of giving substantial deference to the district court. Our deference will be limited somewhat, however, because there is a countervailing policy in favor of a uniform application of the law. A review of our past cases reveals that many of the same "justice and equity" factors appear again and again in disconnection disputes such that we should ensure an appropriate level of consistency. Accordingly, we will review a trial court's "justice and equity" determination as a mixed question of fact and law subject to substantial deference, but not so much deference that we will reverse such a determination only if clearly erroneous.

2. The District Court's Factual Findings Were Proper to Consider Under the "Justice and Equity" Determination

¶ 59 The district court determined that "justice and equity" favored disconnection. The court primarily made three factual findings in support of its decision: "(1) Undeveloped land has historically been found to be appropriate for disconnection"; "(2) Bluffdale's zoning and planning process as applied to South Farm reflects unreasonable delay and arbitrarily changing standards"; and "(3) Bluffdale's current political environment precludes an orderly development process." Bluffdale argues that these and other factors

the district court considered were inappropriate to determine whether "justice and equity" require disconnection. We disagree.

¶ 60 The "justice and equity" requirement grants broad discretion to the district court; therefore, the court may properly consider a wide range of factors favoring or disfavoring disconnection. The district court "received opinion from virtually every witness that testified as to why justice and equity either did or did not require disconnection in this case." Such extensive fact-finding is contemplated under the statute's broad grant of discretion, and a review of our case law confirms that we have always considered a long list of relevant factors in disconnection disputes. Furthermore, our prior cases, although weighing "justice and equity" under different versions of the disconnection statute, have considered many of the same factors as the district court did below.[53]

3. Bluffdale Fails to Adequately Challenge the Factual Findings Supporting the District Court's Determination that "Justice and Equity" Require Disconnection

¶ 61 Bluffdale challenges the factual findings made by the district court in support of its "justice and equity" determination primarily on the ground that it was inappropriate for the court even to consider such findings in assessing "justice and equity." While Bluffdale further argues that these factual findings are clearly erroneous, it makes little effort to marshal the evidence in the record supporting them. Moreover, Bluffdale conceded at oral argument that it was not challenging the court's finding that the planning and zoning process was characterized by unreasonable delay. Inasmuch as we have determined that the district court appropriately considered these factual findings, and in light

52. *Id.* ¶ 25 (internal quotation marks omitted).

53. *In re Disconnection of Certain Territory from Highland City*, 668 P.2d 544, 546 (Utah 1983) (noting that although the City testified it wanted to use the proposed disconnection area as a park or cemetery, "no master plan had officially set it aside for such uses"); *In re Disconnection of Territory & Restriction of Corporate Limits of City of Draper*, 646 P.2d 699, 702 (Utah 1982) (focus-

ing on the undeveloped nature of the disconnection property); *Kennecott Copper Corp. v. City of Bingham Canyon*, 18 Utah 2d 60, 415 P.2d 209, 211 (1966) (considering Kennecott's argument that the necessary extension of its mining operations into unoccupied, incorporated land "has been seriously hampered because of various factors, including the City's requirements relating to zoning regulations and construction purposes").

of the substantial deference we give to the district court's "justice and equity" determination, we cannot say that Bluffdale has met its burden under the standard of review.

### E. The Disconnection Does Not Leave or Create an Unincorporated Island or Peninsula

 ¶ 62 Under the disconnection statute, petitioners must prove by a preponderance of the evidence "that the proposed disconnection will not ... leave or create one or more islands or peninsulas of unincorporated territory."[54] We conclude that the district court erred in its interpretation of the statute as to this question. However, we affirm the court's ultimate conclusion and hold that the disconnection in this case will not leave or create an island or peninsula of unincorporated territory.

1. Islands and Certain Peninsulas Are Prohibited Because They Impair or Inhibit the Provision of Services

¶ 63 The disconnection statute does not define "island"; however, an unincorporated island is presumably surrounded on all sides by incorporated territory. Clearly, if the disconnection creates an island of unincorporated territory, the disconnection is impermissible. There are two primary reasons for this prohibition. First, and least compelling, we have expressed in prior cases a concern for symmetrical city boundaries.[55] A recent version of the statute included language, now stricken, that considered "whether or not islands or unreasonably large or varied-shaped peninsular land masses result within or project into the boundaries of the municipality from which the territory is to be disconnected."[56]

¶ 64 Second, and more important, unincorporated islands impair or inhibit the ability of the responsible county to provide services; access to the unincorporated territory may be difficult. We have noted this problem in prior cases.[57] If the county has to cross over incorporated land, with respect to pipelines or other necessary services, the county would be required to obtain easements or assume potentially difficult negotiations with the cities involved. Such problems increase the county's cost of providing necessary services and may ultimately render the provision of such services impractical.

¶ 65 Additionally, unincorporated islands may impair or inhibit a city from providing services from one point in the city to another point, for similar reasons as stated above. Thus, under the disconnection statute, islands disrupt, impair, or inhibit the provision of services and therefore are prohibited.

¶ 66 Unlike islands, some unincorporated peninsulas are permitted. Utah Code section 10–1–104(6) defines "peninsula" as follows:

> "Peninsula," when used to describe an unincorporated area, means an area surrounded on more than½ of its boundary distance, but not completely, by unincorporated territory and situated so that the length of a line drawn across the unincorporated area from an incorporated area to an incorporated area on the opposite side shall be less than 25% of the total aggregate boundaries of the unincorporated area.

This section attempts to define impermissible peninsulas. A peninsula is prohibited only

54. Utah Code Ann. § 10–2–502.7(3)(c)(iii) (2003).

55. *Continental Bank & Trust Co. v. Farmington City*, 599 P.2d 1242, 1247 (Utah 1979) (noting concern with an "asymmetrical city layout" and avoidance of an "unincorporated island"); *Howard v. Town of North Salt Lake*, 7 Utah 2d 278, 323 P.2d 261, 265 (1958) (stating that the "disconnection will not destroy the symmetry of [the town's] boundaries").

56. Utah Code Ann. § 10–2–503 (1999) (amended 2003).

57. *Highland City*, 668 P.2d at 546 (noting that "the district court found that disconnection would create no islands or peninsulas within the City's boundaries that would make it more expensive or difficult to provide municipal services to the area remaining after disconnection"); *City of Draper*, 646 P.2d at 702–03 ("The disconnection will not create islands or peninsulas which would leave the municipality with a residual area that would have the effect of increasing the cost of providing municipal services to disproportionately high or unreasonable levels.").

when it meets both tests under the statute.[58]

¶ 67 As with all unincorporated islands, some unincorporated peninsulas are prohibited because they impair or inhibit the provision of services. Peninsulas that jut into incorporated territory may leave only a narrow neck of land through which the county or city must provide services. Put simply, some peninsulas are too much like an island and therefore are prohibited.

### 2. The Statutory Definition of Peninsula Is Ambiguous

■ ¶ 68 The disconnection statute's definition of peninsula basically consists of a two-part test for determining whether a disconnection creates a prohibited peninsula. To apply this test, we must first determine the "boundary distance" around the "unincorporated area" and whether more than fifty percent of that boundary distance is surrounded by incorporated area.[59] Second, if more than fifty percent of the boundary distance is surrounded by incorporated area, we must draw a line across the unincorporated area from one incorporated area to another incorporated area on the opposite side; if the length of this line is less than twenty-five percent of the total boundary distance of the unincorporated area, then a prohibited peninsula has been created.[60] We hold that this definition of peninsula is ambiguous with respect to both parts of the statutory test.

#### a. Measuring the "Boundary Distance" of the "Unincorporated Area"

■ ¶ 69 The term "unincorporated area" as used in this statute is ambiguous in that it is susceptible to two interpretations. This is illustrated by the fact that the district court measured the "boundary distance" of the "unincorporated area" as including not only the Disconnection Area, but also the entire area of unincorporated land that the Disconnection Area would be joining. The court

stated that "all contiguous unincorporated areas must be considered in making the calculation." Yet "unincorporated area" may reference solely the area proposed for disconnection, so that we measure only the boundary distance of the Disconnection Area itself, apart from all of the contiguous, unincorporated area that it would be joining. Because the term "unincorporated area" is not defined by the statute and is subject to these different interpretations, we hold that the term "unincorporated area" is ambiguous.

■ ¶ 70 "When interpreting an ambiguous statute, we first try to discover the underlying intent of the legislature, guided by the meaning and purpose of the statute as a whole and the legislative history."[61] According to the district court's interpretation of the term "unincorporated area," and given the fact that there is a vast ocean of "unincorporated area" in most cases, there would necessarily be far less than fifty percent of the unincorporated area's boundary distance surrounded by incorporated territory. Thus, as the district court noted, the statute read in this manner means that there will never be a peninsula that satisfies even the first part of the test; as a result, there will never be a prohibited peninsula. Clearly, the Legislature intended to prohibit certain kinds of peninsulas. Therefore, we must reject the district court's interpretation of "unincorporated area" and give meaning to what constitutes the "boundary distance" to be measured.

¶ 71 As noted, the term "unincorporated area" can also be defined, in measuring "boundary distance," as only the area proposed for disconnection. This interpretation is in accord with the statute's purpose of prohibiting at least certain kinds of unincorporated peninsulas. Thus, we measure the "boundary distance" of the Disconnection Area, which is the "unincorporated area" as

---

**58.** We note that we have never applied this definition of peninsula. Prior to the 2003 amendment of the disconnection statute, we appear to have used common sense to determine whether islands or peninsulas were created by the disconnection. *See* Utah Code Ann. § 10–2–503 (1999) (amended 2003); *Highland City*, 668 P.2d at 546; *City of Draper*, 646 P.2d at 702–03.

**59.** Utah Code Ann. § 10–1–104(6) (2003).

**60.** *Id.; see id.* § 10–2–502.7(3)(c)(iii).

**61.** *Hansen v. Salt Lake County*, 794 P.2d 838, 841 (Utah 1990).

that term was apparently intended to be defined by the Legislature. This approach is also consistent with our prior practice of looking at specific peninsula-shaped territories jutting into the municipality as a result of the disconnection and determining whether they are permissible.[62] So in this case, when we measure only the Disconnection Area, the first part of the statutory test is satisfied; more than fifty percent of the Disconnection Area's boundary distance is surrounded by incorporated territory.[63] Accordingly, we now consider whether the second part of the test is satisfied.

b. Drawing a Line Across the Unincorporated Area from an Incorporated Area to an Incorporated Area on the Opposite Side

¶ 72 The second part of the test determines whether the shape of the unincorporated peninsula is the kind that is offensive to the statute. The statute states that we must draw a line across the "unincorporated area," which we have determined is the Disconnection Area only.[64] This line must be drawn from "an incorporated area to an incorporated area on the opposite side."[65] If the length of this line is less than twenty-five percent of the total boundary distance of the Disconnection Area, then a prohibited peninsula has been created and the disconnection is impermissible. But the statute gives no guidance as to where this line should be drawn. It is impossible to determine where the line should start or where the line should end. There are multiple places where a line could be drawn from one side to the opposite side. Indeed, both parties have suggested different line-drawing options, one that results in a line less than twenty-five percent of the total boundary distance and one that results in a line more than twenty-five percent of the total boundary distance.[66] As a result, the requirement that a line be drawn to an "incorporated area on the opposite side" is arbitrary and renders the second part of the statutory test hopelessly ambiguous.

¶ 73 When faced with a statutory ambiguity, we seek to ascertain the intent of the Legislature. Here, although the Legislature failed to clearly describe the kinds of peninsulas that are prohibited, it undoubtedly intended to prohibit certain peninsulas. So while it is unclear what the precise contours of prohibited peninsulas would be, the purpose of the Legislature is clear—to guard against the impairment of the provision of services. Thus, we are left to make a practical, common sense assessment of the effect of the peninsula created by the disconnection in this case.

¶ 74 We conclude that the Disconnection Area is not the kind of peninsula the Legislature intended to prohibit. First, allowing disconnection of the Disconnection Area would not leave Bluffdale with an unreasonable, asymmetrical boundary. Second, allowing disconnection would not impair the provision of services. Bluffdale would face no impediment to providing services from one point within its remaining boundaries to another point within those boundaries. And the County would not be significantly impaired in providing services to the Disconnection Area even if it remained unincorporated. This fact is of little consequence, however, in light of the fact that the parties agree it is inevitable that the Disconnection Area will be annexed by the City of Herriman.

---

62. *See* Utah Code Ann. § 10–2–503 (1999) (amended 2003); *Highland City*, 668 P.2d at 546; *City of Draper*, 646 P.2d at 702–03.

63. According to Bluffdale City's engineer, the "boundary distance" of the Disconnection Area is 90,399.91 feet. The Disconnection Area is surrounded by 51,559 feet of incorporated territory, which is more than fifty percent of the total boundary distance.

64. Utah Code Ann. § 10–1–104(6).

65. *Id.*

66. Bluffdale argues the shortest line that can be drawn across the area proposed for disconnection is 3,936 feet long, while the longest such line is 17,146 feet long, which renders both lines less than twenty-five percent of the total boundary distance of 90,399.91 feet. But the district court correctly noted that "[i]n virtually any disconnection, it would be possible to draw a line from incorporated territory to incorporated territory on the opposite side that either does or does not meet the test."

¶ 75 In sum, the primary purpose of the ambiguous statutory definition of peninsula is to guard against the impairment of services. The Disconnection Area is not the kind of peninsula that would significantly impair or inhibit the provision of services. Accordingly, we hold that the shape of the Disconnection Area in this case is permissible.

### F. Disconnection Is an Appropriate Remedy

¶ 76 Bluffdale argues that disconnection is precluded because the Plaintiffs' only remedies lie either in an appeal of the City's land use decision or in the application of the boundary adjustment statute. We disagree and affirm the district court's holding that disconnection is an appropriate remedy in this case.

1. The Plaintiffs Are Not Limited to an Appeal of the Zoning Decision

¶ 77 Utah Code section 10–9a–801 provides that any person adversely affected by a municipality's land use decision may file an appeal with the district court.[67] Bluffdale argues that the Plaintiffs were required to seek this remedy but did not because they would not have been able to meet the "arbitrary and capricious" standard of review.[68] Although it was the Plaintiffs' right to appeal Bluffdale's December 9, 2003 rejection of the General Plan Amendment, the Plaintiffs were not precluded from also filing a disconnection petition with the district court pursuant to section 10–2–502.5. Indeed, the Plaintiffs properly filed a request for disconnection with the City, and only thereafter did they seek relief from the district court as provided by statute.

¶ 78 Bluffdale further suggests that landowners will now attempt to disconnect from a municipality every time they disagree with a municipality's land use decision. But as the district court noted, "It is a rare circumstance that a landowner affected by a planning and zoning decision could meet all the tests required for a successful disconnection case." Moreover, if landowners do meet all of the tests under the statute, as in this case, then, consistent with the legislative intent of the statute, they should be granted disconnection.

2. The Boundary Adjustment Statute Is a Remedy Solely for Municipalities, While the Disconnection Statute Is a Remedy for Private Property Owners

¶ 79 Bluffdale argues that section 10–2–419 provides the exclusive remedy for any municipal boundary adjustment. This argument is belied by the text of that statute, as well as by section 10–2–510.

¶ 80 The plain language of section 10–2–419(1) limits the boundary adjustment remedy to neighboring municipalities. Section 10–2–419(1) states as follows: "The legislative bodies of two or more municipalities having common boundaries may adjust their common boundaries as provided in this section." [69] Only municipalities "having common boundaries" may adjust their boundaries under this section. Furthermore, Bluffdale ignores the plain language of the disconnection statute, which explicitly gives private property owners a means of adjusting municipal boundaries. Indeed, every disconnection, by its very nature, will adjust municipal boundaries.

¶ 81 While section 10–2–510 provides that the disconnection statute "shall not be construed to abrogate, modify, or replace the boundary adjustment procedure provided in Section 10–2–419," the fact that private property owners may use a disconnection does not "abrogate, modify, or replace" the right of municipalities to use the boundary adjustment procedure. Neighboring municipalities are still free to adjust their boundaries.

¶ 82 Accordingly, the Plaintiffs could have appealed Bluffdale's land use decision to the district court, but were not precluded from filing a disconnection petition with the dis-

---

67. Utah Code Ann. § 10–9a–801 (Supp.2005) (previously numbered as section 10–9–1001).

68. *Id.* § 10–9a–801(3)(a)(ii) ("The courts shall ... determine only whether or not the decision,

ordinance, or regulation is arbitrary, capricious, or illegal.").

69. *Id.* § 10–2–419(1) (2003).

trict court after the City denied a request for disconnection.[70]

## CONCLUSION

¶ 83 We affirm the district court's determination that the Plaintiffs met their burden of proving the statutory requirements for disconnection. Accordingly, we affirm the district court's decision granting disconnection.

¶ 84 Chief Justice DURHAM, Associate Chief Justice WILKINS, Justice NEHRING, and Judge McHUGH concur in Justice DURRANT'S opinion.

¶ 85 Having disqualified herself, Justice PARRISH does not participate herein; Court of Appeals Judge CAROLYN B. McHUGH sat.

---

**70.** *See id.* §§ 10–2–502.5, 10–9a–801.