2008 UT App 477

**STATE of Utah, in the interest of C.D., A.D., J.T., and S.T., persons under eighteen years of age.**

**A.D.T. and L.D., Appellants,**

v.

**State of Utah, Appellee.**

**No. 20070978–CA.**

Court of Appeals of Utah.

Dec. 26, 2008.

Joyce G. Smith, Blanding, and William L. Schultz, Moab, for Appellants.

Mark L. Shurtleff, atty gen., and John M. Peterson, asst. atty. gen., Salt Lake City, for Appellee.

Martha Pierce, Salt Lake City, Guardian Ad Litem.

Before Judges BILLINGS, DAVIS, and McHUGH.

## OPINION

McHUGH, Judge:

¶ 1 This case requires us to interpret the federal Indian Child Welfare Act (the ICWA), *see* 25 U.S.C. §§ 1901–63 (2000), and determine its proper application within the framework of the abuse, neglect, and dependency provisions of Utah's Juvenile Court Act of 1996, *see* Utah Code Ann. §§ 78A–6–301 to –324 (Supp.2008).[1] Mother and Grandfather appeal the juvenile court's December 5, 2007 Findings of Fact, Conclusions of Law, and Adjudication Order wherein custody and guardianship of C.D., A.D., J.T., and S.T. were granted to the Division of Child and Family Services (DCFS). We affirm in part, reverse in part, and remand for further proceedings consistent with this decision.

1. In February 2008, the Utah Juvenile Court Act was recodified and section 78A–6–301 was added. *See* Utah Code Ann. §§ 78A–6–301 to –324 (Supp.2008) (amend.notes). The previous relevant sections, 78–3a–301 to –321, contained substantially the same language as the current code. Accordingly, we cite to the current version as a convenience to the reader.

## BACKGROUND

¶ 2 Mother has four children: C.D. was born in 2000; A.D. was born in 1992; J.T. was born in 1995; and S.T. was born in 1996. Mother, Grandfather (collectively Appellants), and all four children are members of the Navajo Nation. On December 5, 2002, the State filed a Verified Petition for Protective Services and sought to remove the children from Mother, who could not parent them due to mental health issues. The exact details of that proceeding are not relevant to this appeal, other than the fact that on October 20, 2003, the parties stipulated that Grandfather would maintain permanent guardianship and custody of the children.[2] Mother's parental rights were not terminated; she and her children moved in with Grandfather.

¶ 3 In July 2007, after learning of abuse by Grandfather, the State removed the children and again initiated child custody proceedings. Notice of the proceedings was sent to the Navajo Nation on August 6, 2007. The Navajo Nation did not respond or seek to intervene in the matter, which proceeded to trial.

¶ 4 The State presented evidence of abuse, resulting in findings of fact entered by the juvenile court that Grandfather hit S.T. "on the side of her head on her temple area and on her forehead many times," "pushed [S.T.] down the stairs," "hit [A.D.] in the head with a heavy, filled garbage bag," "put [C.D.] in a closet when he cried," "caused [S.T.] great emotional distress by taking away a kitten . . . and later telling [S.T.] that he had . . . run over the kitten with his car," and "push[ed A.D.]'s head into a door so hard that it left a dent in the door."[3] The juvenile court also found that, while away visiting her grandmother, A.D. "wrote a suicide letter and was intending to take her life the same night but was discovered [and

that].... [A.D.]'s suicide attempt or threat . . . was genuine and serious and was caused by her despair over [Grandfather]'s abuse of her and her siblings."

¶ 5 The juvenile court, in an apparent attempt to address the ICWA, also determined that "Grandfather was in a unique position to raise and protect these children." "[Grandfather] has had years of experience, education, and training in the area of child welfare and has worked for many years for the Division of Child and Family Services in various capacities, including that of a foster care caseworker." Based on this evidence and the prior proceedings involving Mother, the court found that

> [t]he [d]ivision has made active efforts to prevent the break[u]p of the Indian family as is evidenced by the previous proceedings where the children were removed and placed in the custody and guardianship of [Grandfather] while [Mother] still lived in the home. [Grandfather]'s education, employment and training should have ensured that the [d]ivision had made a placement where no abuse o[f] the children would occur. The efforts of the [d]ivision to prevent the breakup of the family were unsuccessful.

¶ 6 Based on this evidence, the juvenile court orally granted custody and guardianship of the four children to DCFS on October 12, 2007. On November 13, 2007, the juvenile court held a hearing, after which the goal for the children was "changed to permanent custody and guardianship." Mother's direct appeal from the November 13 hearing was dismissed by this court for lack of jurisdiction because it did not arise from a final order. *See In re C.D.*, 2008 UT App 37U, 2008 WL 256585 (mem.) (per curiam). The juvenile court then entered its written Findings of Fact, Conclusions of Law, and Adjudication Order on December 5, 2007. Mother

---

**2.** Grandfather previously had been prohibited by the Seventh District Juvenile Court from having contact with the children due to his prior physical and sexual abuse of his daughters. Mother and the minor children subsequently relocated, and the Seventh District Juvenile Court's order was set aside as "unsubstantiated" by the Third District Juvenile Court. At the same time, Grandfather was appointed as the children's guardian.

**3.** The juvenile court further found that "[w]hile there was no testimony about sexual abuse during the trial, there was testimony about inappropriate behavior. [Grandfather] put frosting on [A.D.]'s cheek and licked it off saying that she tasted good. He put his arms around [A.D.] and held her tight and whispered in her [ ]ear."

and Grandfather appealed from that final order. On March 27, 2008, this court issued two memorandum decisions resolving the majority of Grandfather's and Mother's arguments on appeal. *See In re C.D.*, 2008 UT App 111U, para. 10, 2008 WL 802930 (mem.) (per curiam) (Grandfather's appeal); *In re C.D.*, 2008 UT App 62U, para. 7, 2008 WL 802934 (mem.) (per curiam) (Mother's appeal). However, we requested further briefing regarding Mother's and Grandfather's contentions that the State failed to comply with the ICWA, *see* 25 U.S.C. §§ 1901–63 (2000). We now address those arguments.

## ISSUES AND STANDARDS OF REVIEW

█ ¶ 7 As directed by our March 27, 2008 memorandum decisions, the parties have briefed two issues for this court: "(1) Whether the juvenile court properly determined that DCFS made active efforts to prevent the break[up] of the Indian family, and; (2) Whether the juvenile court complied with [the] ICWA regarding applying the required preferences or determining good cause excused the preferences in the placements of the children," *see In re C.D.*, 2008 UT App 111U, para. 10, 2008 WL 802930; *accord In re C.D.*, 2008 UT App 62U, para. 7, 2008 WL 802934. We "review[ ] the juvenile court's factual findings for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." *In re A.C.*, 2004 UT App 255, ¶ 9, 97 P.3d 706 (internal quotation marks omitted).

¶ 8 The State and the Guardian Ad Litem (GAL) (collectively Appellees) also challenge

our jurisdiction. The GAL argues that this court does not have jurisdiction to consider whether DCFS made active efforts to prevent the breakup of the Indian family as required by the ICWA. *See* 25 U.S.C. § 1912. Further, both the State and the GAL argue that we do not have authority to review DCFS' compliance with the placement preferences mandated by the ICWA, *see id.* § 1915(b). To provide some context for our analysis, we address Appellees' jurisdictional arguments within the substantive discussion of the active efforts and placement preference requirements.

## ANALYSIS

¶ 9 Our task of resolving the issues raised by this appeal is complicated by the fact that, since the ICWA was adopted in 1978, courts have struggled to apply it, often reaching inconsistent conclusions about the meaning of various terms.[4] Despite these conflicts among the states, there have been no amendments to the ICWA. In addition, the United States Supreme Court has issued only one decision interpreting the ICWA in the thirty years since it became effective. *See Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989). With those limitations in mind, we begin our analysis, as we must, with the language of the statute. *See generally Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.").

---

4. *See, e.g., In re Adoption of Hannah S.*, 142 Cal.App.4th 988, 48 Cal.Rptr.3d 605, 609–10 (2006) (recognizing a split of authority among the various appellate districts in California regarding the existing Indian family exception); *In re Brooke C.*, 127 Cal.App.4th 377, 25 Cal.Rptr.3d 590, 594 (2005) ("We recognize the split of authority as to whether a violation of the ICWA['s notice requirements] constitutes jurisdictional error."); *In re A.P.*, 25 Kan.App.2d 268, 961 P.2d 706, 713 (1998) (noting a split of authority in the standard of review for denial of transfer to a tribal court); *In re Nicole B.*, 175 Md.App. 450, 927 A.2d 1194, 1206 (2007) ("Definitions of 'active efforts' under the federal statute vary by state ...."), *cert. granted*, 402 Md. 36, 935 A.2d 406 (Nov. 7, 2007); *In re G.S.*, 2002 MT 245, ¶ 31,

312 Mont. 108, 59 P.3d 1063, 1071 ("There is a split of authority as to what evidentiary standard is required under § 1912(d)."); *In re Adoption of Riffle*, 277 Mont. 388, 922 P.2d 510, 514 (1996) (addressing split of authority regarding the definition of "good cause"); *id.* at 513–14 (rejecting cases from California that declare the ICWA unconstitutional when applied to families that do not have a significant relationship to the tribe (citing *In re Bridget R.*, 41 Cal.App.4th 1483, 49 Cal.Rptr.2d 507 (1996))); *In re D.A.C.*, 933 P.2d 993, 998 (Utah Ct.App.1997) ("Our sister states are significantly split on the application of the existing Indian family doctrine."); *id.* at 1000 (stating that whether the ICWA should apply in an intra-family dispute involved "a split of authority among our sister jurisdictions").

I. DCFS Was Not Required to Make Further Active Efforts With Grandfather When Those Efforts Would Be Futile.

¶ 10 Section 1912 of the ICWA provides: "Any party seeking to effect a foster care placement of . . . an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d). Appellants argue that DCFS did not satisfy the active efforts requirement of the ICWA before removing the children from Grandfather. The State disagrees, claiming that the efforts made with Mother were sufficient to satisfy any obligation to this Indian family and, in the alternative, that efforts with Grandfather would be futile. The GAL joined the State's arguments in its appellate brief but during oral argument challenged the court's jurisdiction to consider this issue.[5] We first consider that challenge to our jurisdiction. See Housing Auth. of Salt Lake v. Snyder, 2002 UT 28, ¶ 11, 44 P.3d 724 ("[B]ecause it is a threshold issue, we address jurisdictional questions before resolving other claims.").

A. We Have Jurisdiction to Review DCFS' Compliance with the ICWA's Active Efforts Requirement.

■ ¶ 11 The GAL does not dispute that the trial court's Findings of Fact, Conclusions of Law, and Adjudication Order is properly before us on appeal. Rather, the GAL argues that we lack jurisdiction because the State need demonstrate compliance with the active efforts requirement only as part of

the permanency hearing, which is not before us on appeal. We disagree.

¶ 12 Although the ICWA expressly requires active efforts, there is a dearth of authority addressing exactly when the State must begin complying with that requirement or when the deadline for demonstrating compliance occurs. Indeed, the only authorities the parties submitted on this issue are contained in the GAL's supplemental letter pursuant to rule 24(j) of the Utah Rules of Appellate Procedure, see Utah R.App. P. 24(j). The GAL's authorities, and others like them, however, simply hold that the State need not satisfy the active efforts requirement before the emergency removal of a child. Rather, the duty arises "only as part of the foster care or termination proceedings." B.J. Jones, et al., The Indian Child Welfare Act Handbook 92 (2d ed.2008); see also, e.g., In re S.B., 130 Cal.App.4th 1148, 30 Cal.Rptr.3d 726, 734–36 (2005) (ruling that an emergency removal was not a " 'foster care placement' within the meaning of the ICWA"); In re G.S., 2002 MT 245, ¶ 34, 312 Mont. 108, 59 P.3d 1063 (ruling the state need not demonstrate active efforts before emergency removal but "must work towards meeting th[at] requirement[ ] from the time it becomes involved with a family until a show cause hearing is held"); In re Jade Charles, 70 Or.App. 10, 688 P.2d 1354, 1358 (1984) ("[T]he [active efforts] required by § 1912(d) need only be made in a hearing on the merits of foster care placement or parental rights termination."); H.R.Rep. No. 95–1386, at 25 (1978), U.S.Code Cong. & Admin.News 1978, at 7530, 7548 ("[The ICWA] would permit, under applicable State law, the emergency removal of an Indian child from his parent or Indian custodian . . . notwithstanding the provisions of this title.").[6]

---

5. Typically, arguments raised for the first time during oral argument are waived. See, e.g., Foothill Park, LC v. Judston, Inc., 2008 UT App 113, ¶ 4 n. 4, 182 P.3d 924 (refusing to consider argument raised for the first time during oral argument). However, subject matter jurisdiction may be raised at anytime, see Housing Auth. of County of Salt Lake v. Snyder, 2002 UT 28, ¶ 11, 44 P.3d 724, and the court has an independent duty to examine its own jurisdiction, see Varian–Eimac, Inc. v. Lamoreaux, 767 P.2d 569, 570 (Utah Ct.App.1989) ("[T]he initial inquiry of any court should always be to determine whether the

requested action is within its jurisdiction."). We are aided in our analysis, however, when parties research, evaluate, and present such challenges either in a motion for summary disposition, see Utah R.App. P. 10, or as part of their briefs, see id. R. 24.

6. These authorities contradict the State's contention that requiring active efforts would "result in leaving children . . . in actual or imminent danger of physical harm while such stop-gap measures[—active efforts—are] effected."

While the rule articulated by these sources provides some guidance, it does not answer the question here, because it does not identify which of the several steps in the post-emergency foster care or termination proceedings should initiate or terminate the State's burden under the ICWA's active efforts mandate.

■ ¶ 13 In general, the promulgation of child welfare procedures is a matter reserved by the states and therefore has resulted in varying procedural requirements. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (" '[T]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.' " (quoting *In re Burrus*, 136 U.S. 586, 593–94, 10 S.Ct. 850, 34 L.Ed. 500 (1890))); *see also* Utah Code Ann. §§ 78A–6–301 to –324 (Supp.2008) (establishing Utah's abuse, neglect, and dependency proceedings). The mandates of the ICWA, however, are based on the federal government's "plenary power over Indian affairs," 25 U.S.C. § 1901(1) (2000) (citing U.S. Const. art. I, § 8, cl. 3), and establish uniform "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes," *id.* § 1902. Consequently, where it is not possible to harmonize the ICWA with Utah's child welfare procedures, the federal statute governs. *See generally* U.S. Const. art. VI, cl. 2 ("[T]he laws of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.").

¶ 14 Congress passed the ICWA in recognition that state law was inappropriately addressing the removal and placement of Indian children. *See, e.g.,* 25 U.S.C. § 1901(5) ("States, exercising their recognized jurisdiction over Indian child custody proceedings ..., have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families."). *See generally Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32–37, 44–45, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (providing analysis on the application and intent of the ICWA). However, the ICWA was not a complete repudiation of the state laws and procedures applicable to these cases. Although the ICWA created a mechanism whereby many Indian child welfare cases are now handled by tribal courts, a substantial number of these cases continue to be decided by state courts. *See* 25 U.S.C. § 1911. Notably, the ICWA did not replace the general procedural provisions applicable to these state child welfare cases. *See, e.g., In re Brandon M.*, 54 Cal.App.4th 1387, 63 Cal. Rptr.2d 671, 677 (1997) ("[T]he ICWA is totally devoid of any provisions dealing with, e.g., the bases on which a child may be removed from a parent's custody, when and how often hearings must be held to review a child's status, who is entitled to what reunification services and for how long, or many, many other similar issues."). Instead, Congress focused upon more core procedural and substantive protections—providing a right to counsel, requiring notice to the tribes, invalidating illegal proceedings, providing rehabilitative services, and imposing high standards of proof. *See* 25 U.S.C. §§ 1902–15; *Holyfield*, 490 U.S. at 36–37, 109 S.Ct. 1597. So long as the intent of the ICWA is preserved and these core protections are satisfied, the underlying procedural framework has been left to the states. *See In re Brandon M.*, 63 Cal.Rptr.2d at 677–78 ("Congress clearly intended that [the ICWA] exist side-by-side with the child custody laws of the 50 states and necessarily understood that the courts of those states would and should attempt to harmonize, not presume conflicts between, the two."); Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, 67,584–86 (Nov. 26, 1979) (acknowledging that the states may adopt their own rules so long as they are in accordance with the intent of the ICWA).[7] Thus, the essen-

---

7. The guidelines promulgated by the Department of the Interior "[we]re not intended to have binding legislative effect." Guidelines for State Courts; Indian Child Custody Proceedings, 44

Fed.Reg. 67,584, 67,584 (Nov. 26, 1979). Nevertheless, they "represent the interpretation of the Interior Department" and "will help assure that rights guaranteed by the Act are protected when

tial question here is how to integrate the ICWA's federally mandated protections with Utah's independent abuse, neglect, and dependency procedures, *see* Utah Code Ann. §§ 78A–6–301 to –324 (Supp.2008).[8]

¶ 15 Under Utah's abuse, neglect, and dependency statutes, the juvenile court first considers "reunification services" as part of the shelter hearing. *See id.* § 78A–6–306(10)(a). At that hearing, the juvenile court must determine whether reasonable efforts were made to prevent the need for removal and "whether there are available services that would prevent the need for continued removal." *Id.* "Where [DCFS'] first contact with the family occurred during an emergency situation in which the child could not safely remain at home, the court shall make a finding that any lack of ... preventive efforts was appropriate." *Id.* § 78A–6–306(11).

¶ 16 Later, during the dispositional hearing, the juvenile court must again determine whether reunification services are necessary or appropriate and order such services if they are. *See id.* § 78A–6–312(2)(d) & (4). When such services are ordered, the juvenile court must conduct a "hearing ... no more than six months after the initial removal ... in order for the court to determine whether: (1) [DCFS] has provided and is providing 'reasonable efforts' to reunify a family ... and (2) the parent has fulfilled or is fulfilling identified duties and responsibilities." *Id.* § 78A–6–313. In addition, the juvenile court must hold a permanency hearing "no later than 12 months after the original removal of the minor,"[9] *id.* § 78A–6–314(1)(a), where the juvenile court should consider the "efforts or progress demonstrated by the parent," *id.* § 78A–6–314(3)(d), and determine

"whether the minor may safely be returned to the custody of the minor's parent," *id.* § 78A–6–314(2)(a).

¶ 17 Generally, Utah's procedural approach to providing reunification services is compatible with the ICWA's mandate that the state make active efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family," 25 U.S.C. § 1912(d). Consequently, the timing and implementation of the federal active efforts mandate should track the statutory framework applicable to Utah's reasonable efforts requirement, to the extent that such parallelism does not conflict with the ICWA's goals. Thus, much like non-Indian child welfare proceedings, in cases involving an Indian child, the juvenile court should "make a determination [as part of the shelter hearing] as to whether [active] efforts were made to prevent or eliminate the need for removal," *cf.* Utah Code Ann. § 78A–6–306(10)(a), or whether the lack of such active efforts was appropriate, *cf. id.* § 78A–6–306(11), as well as "whether there are available services that would prevent the need for continued removal," *id.* § 78A–6–306(10)(a)(i). Likewise, the court should determine whether active efforts are required as part of the dispositional hearing. *Cf. id.* § 78A–6–312(2)(d) & (4). Assuming the juvenile court determines active efforts are required, the matter should continue to the six-month review and then the permanency hearing, where the juvenile court must ultimately determine whether the active efforts have been successful. *Cf. id.* §§ 78A–6–313 to –314.

¶ 18 In this case, the juvenile court appears to have combined the adjudication hearing and the dispositional hearing into the

---

state courts decide Indian child custody matters." *Id.* We therefore find them helpful to our analysis and refer to them throughout this opinion.

**8.** Some states have adopted express statutory provisions designed to address this process. *See, e.g.,* Iowa Code Ann. §§ 232B.1–.14 (West 2006); Neb.Rev.Stat. Ann. §§ 43–1501 to–1516 (LexisNexis 2005); Okla. Stat. Ann. 10 §§ 40–40.9 (West 2007). Utah has done so only in a limited manner. *See* Utah Code Ann. § 78A–6–307(1)(b)(ii) (Supp.2008) (defining "relative" to include "extended family member" as that term

is used in the ICWA when the minor is an Indian child); *id.* § 78A–6–318 (limiting foster parent's right to petition removal of a child when "the removal was for the purpose of ... placing an Indian child in accordance with preplacement preferences and other requirements described in the Indian Child Welfare Act").

**9.** "If reunification services were not ordered at the dispositional hearing, a permanency hearing shall be held within 30 days from the date of the dispositional hearing." Utah Code Ann. § 78A–6–314(1)(b) (Supp.2008).

same proceeding held in October 2007, and entered only one written ruling that addressed both hearings. *See generally id.* § 78A–6–311(2) ("The dispositional hearing may be held on the same day as the adjudication hearing...."); Utah R. Juv. P. 46(a) ("Disposition hearings may ... follow immediately after that portion of the hearing at which the allegations of the petition are proved."). Indeed, as part of its Findings of Fact, Conclusions of Law, and Adjudication Order, the juvenile court not only determined that the children were "abused and/or neglected and/or dependent," *see generally* Utah Code Ann. § 78A–6–311 (discussing adjudication hearings), but also granted custody and guardianship of the children to DCFS, ruled that reunification services were not appropriate, and ordered a permanency hearing to be held on November 13, 2007—actions that are consistent with a dispositional hearing, *see id.* § 78A–6–312 (discussing dispositional hearings). Moreover, the next entry in the record is the order from the November 13, 2007 hearing. Although that order is captioned "Minutes and Order 12–Month Dispositional Review," it indicates that it is entered pursuant to section 78–3a–311, *see* Utah Code Ann. § 78–3a–311 (current version as amended at Utah Code Ann. § 78A–6–312 (Supp.2008)) (dispositional hearings), *or* pursuant to section 78–3a–312, *see id.* § 78–3a–312 (current version as amended at Utah Code Ann. § 78A–6–314 (Supp.2008)) (permanency hearings). Furthermore, both this court—in *In re C.D.*, 2008 UT App 37U, para 1 (mem.) (per curiam)—and the juvenile court—in its Minutes entered on October 26, 2007 and Order entered on December 5, 2007—have previously described the Minutes and Order 12–Month Dispositional Review as an order from the

permanency hearing. We further note that while a permanency hearing must be held within twelve months of the original removal, *see* Utah · Code Ann. § 78A–6–314(1)(a), a disposition hearing must be held within thirty days of the adjudication hearing, *see id.* § 78A–6–311(2). Because there were not any other proceedings between the October 2007 hearing and the November 13, 2007 permanency hearing, we conclude that the October proceeding was intended to function as both the adjudication hearing and the dispositional hearing. *See generally id.* §§ 78A–6–311(2), –314(1)(b) (requiring a dispositional hearing simultaneously with or shortly after the adjudication hearing but before the permanency hearing).

¶ 19 As part of its combined adjudication and dispositional order, the trial court concluded that active efforts either already had been made and were unsuccessful or were not required because they would be futile.[10] That ruling completely ended the juvenile court's active efforts inquiry. Further, we have concluded that the dispositional hearing was combined with the adjudication hearing and subsumed in the single order, which order the GAL does not dispute is properly before us on appeal. *See generally* Utah R. Juv. P. 46(c) ("After announcing its order [from the disposition hearing], the court shall advise any party who is present ... of the right to appeal the court's decision."); *In re S.H.*, 2007 UT App 8, ¶ 9 n. 1, 155 P.3d 109 (allowing an appeal from a disposition hearing); *In re S.A.K.*, 2003 UT App 87, ¶¶ 10–15, 67 P.3d 1037 (same). *Cf. In re E.R.*, 2001 UT App 66, ¶ 10, 21 P.3d 680 (determining that a party waived his right to appeal when he "never attempted to appeal the final order arising from the dispositional hearing"). Because that final order completely resolved

---

**10.** The juvenile court also indicated that no reunification services were required because there was aggravated or severe abuse of the children. Although the federal Adoption and Safe Families Act (ASFA) and the Utah Code both provide for an exception to their requirements of *reasonable efforts* when there is aggravated abuse, *see* 42 U.S.C. § 671(a)(15)(D)(I) (2000); Utah Code Ann. § 78A–6–312(3)(d)(i)(E)–(F), whether that same exception applies to the *active efforts* required by the ICWA is still an open question in Utah and has been decided inconsistently by other jurisdictions. *Compare J.S. v. State*, 50 P.3d

388, 392 (Alaska 2002) (relying on the ASFA as support for its ruling that active efforts were not required under the ICWA in cases of sexual abuse by a parent), *with In re J.S.B.*, 2005 SD 3, ¶ 21, 691 N.W.2d 611, 619 ("[W]e do not think Congress intended that ASFA's 'aggravated circumstances' should undo the State's burden of providing 'active efforts' under [the] ICWA."). We need not resolve that issue today because the written Findings of Fact, Conclusions of Law, and Adjudication Order do not refer to the aggravated abuse exception. Moreover, the State does not rely on that exception on appeal.

this issue, we have jurisdiction to consider Appellants' appeal of the State's compliance with the active efforts requirement.[11] Accordingly, we now turn to the substantive arguments raised by the parties concerning active efforts under the ICWA.

## B. Grandfather was an Indian Custodian Entitled to Active Efforts.

¶ 20 A careful review of the statutory definitions contained in the ICWA convinces us that DCFS was effecting a foster care placement when it removed the children from Grandfather and placed them in a foster home. *See* 25 U.S.C. § 1912 (2000) ("Any party seeking to *effect a foster care placement* of ... an Indian child under State law shall satisfy the court that active efforts have been made to ... prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (emphasis added)). Section 1903 defines "'foster care placement'" as "removing an Indian child from its parent *or Indian custodian* for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent *or Indian custodian* cannot have the child returned upon demand, *but where parental rights have not been terminated.*"

*Id.* § 1903(1)(i) (emphasis added). Although Grandfather is not the children's parent, he was the children's Indian custodian.[12] "Indian custodian" is defined by the ICWA as "any Indian person who has legal custody of an Indian child ... under State law." *Id.* § 1903(6). Mother's parental rights were not terminated, but Grandfather was awarded legal custody of these children by the order of a Utah court. Thus, DCFS' subsequent removal of the children from Grandfather was a foster care placement, and the express language of section 1912 required the State to satisfy the active efforts mandate.[13] *See id.* § 1912(d).

## C. The State's Prior Efforts with Mother Cannot be Imputed to Grandfather.

¶ 21 Appellees argue that the State satisfied the active efforts requirement of the ICWA through its prior efforts with Mother and the placement with Grandfather. In support of that contention, they focus upon the language of the ICWA that requires the State to demonstrate "active efforts *have been made* ... to prevent the breakup of the *Indian family.*" 25 U.S.C. § 1912(d) (emphasis added). Although "Indian family" is not defined as part of the ICWA, that term

**11.** The GAL's contrary argument, that appellate review of active efforts must always wait until the permanency hearing is appealable, would produce an irrational result in this case. Here, the juvenile court excused DCFS from making active efforts. Accordingly, there was no reason to address active efforts at the permanency hearing. *See* Utah Code Ann. § 78A–6–314(2)(a) (Supp.2008) ("*If reunification services were ordered* [as part of the dispositional hearing] the court shall, at the permanency hearing, determine ... whether the minor may safely be returned to the custody of the minor's parent." (emphasis added)). In this case, the disposition hearing produced the only ruling that will address active efforts, absent appellate intervention.

**12.** Parents and Indian custodians are treated similarly throughout the ICWA. *See, e.g.,* 25 U.S.C. § 1912(e) (2000) ("No foster care placement may be ordered ... in the absence of ... clear and convincing evidence ... that the continued custody ... by the *parent or Indian custodian* is likely to result in serious emotional or physical damage to the child." (emphasis added)); *id.* § 1912(f) (applying similar rule for termination of parental rights); *id.* § 1903(1)(i) (defining "foster care placement" to include "removing an Indian child from its *parent or Indian custodian*" (emphasis added)); *id.* § 1916(a) (al-

lowing a *parent or Indian custodian* to petition for return of custody if decree of adoption is vacated). "While ... custodian[s] may not have rights under State law, they do have rights under Indian custom which [the ICWA] seeks to protect, including the right to protect the parental interests of the parents." H.R.Rep. No. 95–1386, at 20 (1978), U.S.Code Cong. & Admin.News 1978, at 7543.

**13.** Nevertheless, we do not hold that active efforts are required anytime children are transferred from one foster home to another. Rather, this case is unique because Grandfather was awarded legal custody and guardianship, making him an Indian custodian under the ICWA. *See* 25 U.S.C. § 1903(6). This is in direct contrast with most foster care placements, where DCFS retains legal custody of the children even after placement with a foster parent. *See In re Charloe,* 292 Or. 545, 640 P.2d 608, 609–10, 612–13 (1982) (ruling that aunt did not qualify as an Indian custodian when she cared for her niece pursuant to a traditional foster care placement because the state agency retained legal custody); *In re J.J.,* 454 N.W.2d 317, 327 (S.D.1990) (same for grandmother).

generally has a broader role in Indian society than may otherwise be customary. "An Indian child may have scores of, perhaps more than a hundred, relatives who are counted as close, responsible members of the family." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 35 n. 4, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (internal quotation marks omitted). Thus, Appellees argue that the active efforts standard is "inherently broader and more fluid than the state-law notion of removal" because it "does not refer simply to actions designed to prevent the need for removal on a certain occasion, but rather to the entire history of the interaction between the 'Indian family' and the State's various agencies." Here, Appellees argue that "active efforts ha[d] been made ... to prevent the breakup of th[is] Indian family," *see* 25 U.S.C. § 1912(d), due to the State's previous efforts with Mother and the children's placement with Grandfather. The juvenile court agreed with Appellees' interpretation, finding that "[DCFS] has made active efforts to prevent the break[up] of the Indian family as is evidenced by the previous proceedings where the children were removed and placed in the custody and guardianship of [Grandfather]."

¶ 22 In response, Appellants argue that the ICWA requires more than a once and done approach to active efforts. Under Appellants' interpretation, the State must demonstrate that active efforts have been made to prevent Indian children from being removed from their current parent or Indian custodian, and not just that such efforts were made in the past with respect to some other member of the broad Indian family. Accordingly, Appellants contend that the juvenile court

erred when it found that the State's prior efforts with Mother were sufficient to satisfy the ICWA for purposes of the subsequent removal of the children from Grandfather.

¶ 23 The parties raise an issue of first impression in Utah, and we have found no decisions from other jurisdictions that address it.[14] Moreover, section 1912(d) of the ICWA could be read to support either interpretation. *See* 25 U.S.C. § 1912(d). That section unambiguously requires the State to demonstrate that "active efforts have been made ... to prevent the breakup of the Indian family," but it is silent as to how recent those efforts must be or to whom they must have been directed. *See id.* Thus, we must look beyond the plain language of this section to resolve the issue. *See Bluffdale Mountain Homes, LC v. Bluffdale City*, 2007 UT 57, ¶ 70, 167 P.3d 1016 ("When interpreting an ambiguous statute, we first try to discover the underlying intent of the legislature, guided by the meaning and purpose of the statute as a whole and the legislative history." (internal quotation marks omitted)). *See generally* Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,585–86 (Nov. 26, 1979) (declaring that the ICWA should be interpreted in accordance with its intent).

¶ 24 The ICWA "was the product of rising concern in the mid–1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement." *Holyfield*, 490 U.S. at 32, 109 S.Ct. 1597.[15] "[T]he policy of this Na-

---

14. The authorities the State cites are not on point. In those cases, the courts identified specific efforts that had previously been directed toward the same parent or Indian custodian. *See, e.g., E.A. v. State Div. of Family & Youth Servs.*, 46 P.3d 986, 986, 990–91 (Alaska 2002) (determining extensive prior efforts *with mother* supported termination of *mother's* parental rights); *In re K.D.*, 155 P.3d 634, 636–37 (Colo. Ct.App.2007) (same for father), *cert. denied*, 2007 WL 887679, 2007 Colo. Lexis 249 (Colo. Mar. 26, 2007); *In re T.H.*, 2005 OK Civ App 5, ¶¶ 15–16, 105 P.3d 354, 357–59 (same for mother).

15. A 1976 report to the American Indian Policy Review Commission detailed the status of Indian child welfare cases in Utah.

There are 6,690 Indian children under 21 in Utah. Of these, 328 (or 1 out of every 20.4) Indian children ha[ve] been adopted.... The adoption rate for non-Indian children is 1 out of every 68.5. There are therefore by proportion 3.4 times (340 percent) as many Indian children in adoptive homes as there are non-Indian children.

There are 249 (or 1 out of every 26.4) Indian children in foster care. The foster care rate for non-Indians is 1 out of every 402.9. There are therefore by proportion, 15 times (1,500

tion" when passing the ICWA was "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." 25 U.S.C. § 1902 (2000); *see also* Indian Child Welfare Act of 1978, Pub.L. No. 95–608, 92 Stat. 3069, 3069 ("An Act ... to prevent the breakup of Indian families...."); *Holyfield,* 490 U.S. at 32–34, 37, 109 S.Ct. 1597 (discussing Congress's intent); Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. at 67,585–86 ("Congress through the [ICWA] expressed its clear preference for keeping Indian children with their families...."). Congress declared that "[t]he objective of every Indian child and family service program shall be to prevent the breakup of Indian families and, in particular, to insure that the permanent removal of an Indian child from the custody of his parent or Indian custodian shall be a last resort." 25 U.S.C. § 1931(a) (addressing grants to tribes for Indian child and family service programs). Congress implemented its intent, in part, "by the establishment of minimum Federal standards for the removal of Indian children from their families." *Id.* § 1902. These minimum standards include the active efforts requirement. *See id.* § 1912(d).

¶ 25 Furthermore, the United States Supreme Court has declared that "the standard principles of statutory construction do not have their usual force in cases involving Indian law." *Montana v. Blackfeet Tribe of Indians,* 471 U.S. 759, 761, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985) (interpreting the Indian Mineral Leasing Act of 1938). Rather "[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *Id.* (alteration in original) (internal quotation marks omitted). Thus, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Id.; see also, e.g., Doe v. Mann,* 415 F.3d 1038, 1047 (9th Cir.2005) (interpreting the ICWA in accordance with this rule of construction); *In*

*re J.S.B.,* 2005 SD 3, ¶ 21, 691 N.W.2d 611, 619 (same).

¶ 26 Nevertheless, the State and the GAL argue that DCFS' prior efforts—made four years earlier and directed at Mother—were sufficient to satisfy the active efforts requirement when the children were removed from Grandfather, their Indian custodian. More simply stated, Appellees argue that so long as active efforts have been made at some point with some member of an Indian family, regardless of who that person was or how long ago those efforts occurred, no further efforts are required under the ICWA. We reject Appellees' interpretation of section 1912(d) as contrary to the ICWA's history and intent.

¶ 27 First, we fail to see how Appellees' interpretation of the ICWA "promote[s] the stability and security of Indian ... families." 25 U.S.C. § 1902. Prior to the removal from Grandfather, these Indian children were living in an Indian family: Mother, Grandfather, and all four children lived together. Due to their current removal from Grandfather and placement with two non-Indian foster families, these Indian children have been separated from each other, their mother, and the Indian custodian who had legal custody of them for four years. The removal from Grandfather is a breakup of this Indian family. The ICWA requires active efforts to avoid the breakup of the Indian family or evidence that can support a finding that such efforts would be futile as to Grandfather. *See* Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. at 67,592 (recognizing the ICWA's intent to "alleviate the need to remove the Indian child from his or her parents or Indian custodians").

¶ 28 Second, we conclude that Appellees' interpretation would not "insure that the permanent removal of an Indian child from the custody of his parent or Indian custodian shall be a last resort." 25 U.S.C. § 1931(a). Instead, it would allow removal as a matter of course, so long as the State could demon-

percent) as many Indian children in foster care as there are non-Indian children.
American Indian Policy Review Commission, 94th Cong., Report on Federal, State, and Tribal

Jurisdiction 85 (Comm. Print 1976); *see also id.* at 233–36.

strate that active efforts had been made with any other family member at anytime in the past. In contrast, under Appellants' interpretation the State would be required to prove that it made active efforts "to provide remedial services and rehabilitative programs ... and that th[o]se efforts ... proved unsuccessful," *id.* § 1912(d), anytime it sought to remove Indian children from a parent or an Indian custodian. In other words, removal would always be a "last resort" that was available only after remedial services and active efforts had failed.

¶ 29 We also conclude that construing the ICWA liberally and in favor of the Indians supports an interpretation that requires the State to provide more remedial services and rehabilitative programs for Indian parents and custodians, rather than fewer.

¶ 30 Because Appellees' interpretation conflicts with the history and intent of the ICWA as well as the Supreme Court's mandate that statutes impacting Indians be interpreted to their benefit, we reject it. Rather, we adopt Appellants' more expansive interpretation of section 1912(d) and hold that the State must demonstrate that active efforts have been made with respect to the specific parent or Indian custodian from whom the Indian children are being removed or provide evidence that such efforts would be futile. *See generally* 25 U.S.C. § 1912(d) (2000).

D. The Active Efforts Standard Requires More than the Reasonable Efforts Standard.

■ ¶ 31 In order to evaluate Appellees' alternative argument, that active efforts with Grandfather were not required because they would be futile, it is necessary to understand what the active efforts standard requires, especially when compared to the more common "reasonable efforts" standard present in

many state child welfare statutes. The issue of exactly what constitutes "active efforts" under the ICWA and how this standard relates to the more common reasonable efforts standard has produced a split of authority among the relatively few jurisdictions that have considered the issue. *See, e.g., In re Nicole B.*, 175 Md.App. 450, 927 A.2d 1194, 1206 ("Definitions of 'active efforts' under the federal statute vary by state ...."), *cert. granted*, 402 Md. 36, 935 A.2d 406 (2007). For the Utah appellate courts, this is an issue of first impression.[16]

¶ 32 The majority of jurisdictions that have considered the issue hold that the active efforts requirement " 'sets a higher standard for social services departments than the 'reasonable efforts' required by state statutes.' " *In re J.S.*, 2008 OK Civ App 15, ¶ 14, 177 P.3d 590, 593 (emphasis omitted) (quoting *In re Nicole B.*, 927 A.2d at 1206).[17] These jurisdictions have chiefly relied upon the "common and ordinary meaning of 'active,' [which] means 'characterized by action rather than contemplation or speculation.' " *Id.* ¶ 13 (quoting *Webster Third New International Dictionary* 22 (1986)); *see also A.A. v. Alaska Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999) (distinguishing between active and passive efforts); *In re A.N.*, 2005 MT 19, ¶ 23, 325 Mont. 379, 106 P.3d 556, 560 ("The term active efforts, by definition, implies heightened responsibility compared to passive efforts. Giving the parent a treatment plan and waiting for him to complete it would constitute passive efforts.").

¶ 33 In contrast, two states, California and Colorado, have held that the active efforts requirement is the same as the reasonable efforts requirement. *See, e.g., In re Michael G.*, 63 Cal.App.4th 700, 74 Cal.Rptr.2d 642,

---

**16.** At oral argument, Grandfather suggested that we resolved this issue in *In re D.A.C.*, 933 P.2d 993 (Utah Ct.App.1997). Because the parties in *D.A.C.* "stipulated that the remedial measures provision of [the] ICWA had been met," however, we never considered whether active efforts and reasonable efforts require different levels of involvement by DCFS. *See id.* at 1002.

**17.** *See also* Iowa Code Ann. § 232B.5(19) (West 2006) ("Reasonable efforts shall not be construed

to be active efforts."); *In re J.S.*, 2008 OK Civ App 15, ¶ 14, 177 P.3d 590, 593 (emphasizing that only two states have adopted a different approach); *In re Nicole B.*, 175 Md.App. 450, 927 A.2d 1194, 1206 (adopting the majority position), *cert. granted*, 402 Md. 36, 935 A.2d 406 (2007); *Winston J. v. Alaska Dept. of Health & Soc. Servs.*, 134 P.3d 343, 347 n. 18 (Alaska 2006) (stating that the active efforts requirement is more demanding than reasonable efforts).

650 (1998); *In re K.D.*, 155 P.3d 634, 637 (Colo.Ct.App.2007), *cert. denied,* 2007 WL 887679, 2007 Colo. Lexis 249 (Colo. Mar. 26, 2007). The California court concluded that its reasonable efforts standard is already heightened and that, therefore, the questions of "whether 'active efforts' were made … [or] whether reasonable services under state law were provided, are essentially undifferentiable." [18] *In re Michael G.*, 74 Cal. Rptr.2d at 650. Relying on that analysis, a subsequent California decision declared that "[a]ctive efforts are essentially equivalent to reasonable efforts to provide or offer reunification services in a non-ICWA case." *In re Adoption of Hannah S.*, 142 Cal.App.4th 988, 48 Cal.Rptr.3d 605, 612 (2006).[19]

¶ 34 Because we do not believe that active efforts are "undifferentiable" from reasonable efforts, we reject the minority position. Instead, we join the majority of courts considering this issue that have held that the phrase active efforts connotes a more involved and less passive standard than that of reasonable efforts. We also believe this is the result Congress intended when it explicitly required "active efforts" as part of the ICWA. *See* 25 U.S.C. § 1912(d) (2000).

¶ 35 Although we hold that active efforts require more than reasonable efforts, we also acknowledge that the determination of whether this standard has been met should be made on a case-by-case basis. *See generally A.M. v. State,* 945 P.2d 296, 306 n. 12 (Alaska 1997). Accordingly, the juvenile court is afforded some discretion on this issue. *See In re A.C.,* 2004 UT App 255, ¶ 9, 97 P.3d 706 ("[W]e review[ ] the juvenile court's factual findings for clear error and its conclusions of law for correctness, affording the court some discretion in applying the law to the facts." (internal quotation marks omitted)). Here, the juvenile court considered

the evidence concerning Grandfather's extensive training during the seven years he served as a foster care worker for DCFS and concluded that any further efforts with Grandfather would have been futile. Accordingly, we now review whether the trial court's ruling was proper, applying the heightened active efforts requirement.

E. The Record Supports the Trial Court's Conclusion that Further Efforts Would Be Futile.

¶ 36 Appellees' argue that, even if active efforts were required, Grandfather's prior training and employment with DCFS prove that any further efforts would be futile and therefore were not required. "Although the state must make 'active efforts' under the ICWA, it need not 'persist with futile efforts.'" *In re K.D.,* 155 P.3d at 637 (quoting *In re J.S.B.,* 2005 SD 3, ¶ 29, 691 N.W.2d 611, 621). As the Court of Appeal of California explained, where the State has previously directed efforts toward a particular parent or Indian custodian, the State may assert the futility of further efforts with that person:

> The law does not require the performance of idle acts. And where[, for example,] substantial but unsuccessful efforts have just been made to address a parent's thoroughly entrenched drug problem in a juvenile case involving one child, and the parent has shown no desire to change, duplicating those efforts in a second case involving another child—but the same parent—would be nothing but an idle act.

*Letitia V. v. Superior Court of Orange County,* 81 Cal.App.4th 1009, 97 Cal.Rptr.2d 303, 308–09 (2000) (emphasis omitted) (citation omitted); *see also In re K.D.,* 155 P.3d at 637 ("[T]he 'active efforts' required by 25 U.S.C. § 1912(d) need not be part of a treatment plan offered as part of the current dependen-

---

18. Nevertheless, the California court acknowledged that under the ICWA's active efforts standard "the court shall also take into account 'the prevailing social and cultural conditions and way of life of the Indian child's tribe. [Active efforts] shall also involve and use the available resources of the extended family, the tribe, Indian social service agencies and individual Indian care givers.'" *In re Michael G.,* 63 Cal.App.4th 700, 74 Cal.Rptr.2d 642, 650–51 (1998) (quoting Guidelines for State Courts; Indian Child Custody Pro-

ceedings, 44 Fed.Reg. 67,584, 67,592 (Nov. 26, 1979)).

19. The Colorado court did not address the majority position, instead relying solely on *In re Adoption of Hannah S.,* 142 Cal.App.4th 988, 48 Cal. Rptr.3d 605, 612 (2006). *See In re K.D.,* 155 P.3d 634, 637 (Colo.Ct.App.2007), *cert. denied,* 2007 WL 887679, 2007 Colo. Lexis 249 (Colo. Mar. 26, 2007).

cy proceedings. A department may engage in 'active efforts' by providing formal or informal efforts ... before dependency proceedings begin.").

¶ 37 The juvenile court here found that Grandfather's "education, employment and training" were evidence that further efforts would be futile. The record reflects that Grandfather was employed by DCFS from 1996 until 2003.[20] During that time, he was employed in several positions, including as a foster care worker.[21] Grandfather testified that "there was a great deal of training" through DCFS in connection with his position as a foster care worker. In particular, Grandfather related that he received training on "how to treat children," "how to counsel the parents about how to treat children," "the trauma that children who were removed from homes [experience]," and the need to treat these traumatized children "more gently" than other children. Grandfather also admitted that he had been trained not to call children names, hit or strike them, or lock them in closets. Grandfather described the advice he was trained to give parents dealing with disobedient children, stating:

Q: And if children are unruly and, ah, don't obey their parents, what did you teach, ah, parents that they should do.

A: Usually they—they take into, ah, consideration three things. That's a time out. They can lose a privilege, if it's something that's related to some type of, ah, behavior that would, ah—that they would respond to in terms of loss of a privilege. Ah, then the other is according to their age, ah, standing in the corner.

Q: And if all those things didn't help, children still continued to display behaviors that were, ah, unruly or disobedient, what would you suggest a parent do?

A: That they step back in terms of, ah, that particular time and, ah, attempt

to, ah, soothe the child and ask, you know, what is the problem in terms of why they're doing what they do.

Appellants argue that this prior training is insufficient to meet the ICWA's active efforts requirement, while the State and the GAL argue that the DCFS training was adequate.

¶ 38 As a DCFS foster care worker, Grandfather received specific training on the special needs of children in the child welfare system and the appropriate ways in which those children can be disciplined. Although the record is unclear as to when Grandfather last received training, from his testimony it is apparent that he was well versed on DCFS policy concerning the appropriate methodologies for dealing with unruly children. Through DCFS' training, Grandfather learned the proper methodology for parenting children and had, in fact, taught foster parents those rules. Furthermore, Grandfather's ability to repeat those methods at trial indicate that his training was not too remote in time to be relevant to the removal of his grandchildren.[22] Furthermore, the children were placed with Grandfather the same year that he retired from DCFS, when these parenting guidelines would have been fresh in his mind. DCFS did much more than prepare a service plan ordering Grandfather to take parenting classes. It actually taught those skills specifically to Grandfather at a level that qualified him to teach others. We therefore hold that the juvenile court was within its discretion in concluding that further efforts with Grandfather would be futile. Accordingly, we affirm the juvenile court's determination that further active efforts were not required.

II. The State Must Place the Children In Accordance With the ICWA's Placement Preferences.

¶ 39 As part of the ICWA, Congress created a detailed scheme for the placement of Indian children in foster care.

---

20. The record also indicates that Grandfather was employed as a social worker in various capacities, including his time with DCFS, for approximately twenty years.

21. Although Grandfather's testimony is confusing on this point, it appears that he also worked as an intake worker at DCFS and was on loan to

the Department of Employment Services for some period.

22. We can envision circumstances where training was far enough removed in time or the subject matter not narrowly enough focused to warrant additional efforts to prevent removal from the parent or Indian custodian.

Any child accepted for foster care or pre-adoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with—

 (i) a member of the Indian child's extended family;

 (ii) a foster home licensed, approved, or specified by the Indian child's tribe;

 (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

 (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

25 U.S.C. § 1915(b) (2000).[23]

¶ 40 The United States Supreme Court described the ICWA's placement preferences as "[t]he most important substantive requirement imposed on state courts." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 36–37, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (discussing similar preferences for adoption placement). "More than any other substantive requirement, it reflects the underlying assumption of [the] ICWA that Indian children have a strong interest in preserving their tribal ties, and their best interests coincide with their tribes." *Cohen's Handbook of Federal Indian Law* § 11.05, at 842–43 (Nell Jessop Newton et al. eds., 2005). Thus, "[p]roceedings in state courts involving the custody of Indian children shall follow strict procedures and meet stringent requirements to justify any result in an individual case contrary to the[ ] preferences." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, 67,585–86 (Nov. 26, 1979).

¶ 41 As part of the "strict procedures" and "stringent requirements" required for deviation from the ICWA's preferences, the juvenile court is required to enter a specific finding of good cause if the preferences are not followed. *See, e.g.*, 25 U.S.C. § 1915(a)-(b) (requiring compliance with preferences "in the absence of good cause to the contrary"); *In re Bird Head*, 213 Neb. 741, 331 N.W.2d 785, 791 (1983) (remanding for lack of findings); *In re N.L.*, 754 P.2d 863, 870 (Okla.1988) (same). In addition, the State is required to maintain records "evidencing [its] efforts to comply with the order of preference specified" in section 1915(b). 25 U.S.C. § 1915(e). In fact, the Indian Child Welfare Services Agreement between the Navajo Nation and the State of Utah declares that "[i]n any proceeding in which the State is unable to comply with the ICWA placement preference pursuant to 25 U.S.C. § 1915, the State shall prepare a report documenting its efforts to comply with the order of preference and shall send it to the Nation's ICWA contact person within five (5) working days of the placement."[24]

¶ 42 Appellants argue that the children have not been placed in accordance with the preferences contained in the ICWA and that the State has not established the record necessary to demonstrate good cause for deviating from those preferences. Appellees argue that we lack jurisdiction to hear this issue because compliance with the preferences is not required until the permanency hearing, which is not before us on appeal. Indeed, Appellees contend that appellate review is unavailable unless a final permanency order

---

**23.** Although Indian tribes may "establish a different order of preference by resolution," 25 U.S.C. § 1915(c) (2000), the Navajo Nation does not appear to have done so. The State's brief includes the Indian Child Welfare Services Agreement between the Navajo Nation and the State of Utah, which reiterates that "the preferences and standards for placement provided in 25 U.S.C. § 1915 shall apply in the absence of good cause to the contrary."

**24.** The State concedes that it did not prepare the record required by section 1915(e). Consequently, it could not have sent a copy of it to the Navajo Nation. The record does not reflect whether the Navajo Nation has designated an ICWA contact person.

has been entered.[25] We first address the issue of whether we have jurisdiction over the ICWA preference challenge.

## A. We Have Jurisdiction to Consider Appellants' Placement Preference Argument.

¶ 43 The determination of whether we have jurisdiction is governed by when a final order on compliance with the ICWA preferences must be entered. Therefore, we begin our jurisdictional analysis by considering that issue. Much like the ICWA's active efforts requirement, there are no express statutory provisions declaring when the State must begin or complete compliance with the ICWA's placement preferences. *See* 25 U.S.C. § 1915. Furthermore, we have found very little relevant authority on this issue from Utah or other jurisdictions. *But see In re Desiree F.*, 83 Cal.App.4th 460, 99 Cal. Rptr.2d 688, 700 (2000) ("In determining any placement of [an Indian child], including emergency, foster care, or adoptive, the juvenile court is required to follow the placement preferences set forth in the ICWA."). Accordingly, we again integrate the ICWA's federally mandated placement preferences with Utah's existing child welfare scheme, to the extent we can do so without thwarting the goals of the ICWA. *See In re D.A.C.*, 933 P.2d 993, 997 (Utah Ct.App.1997) ("ICWA provides substantive and procedural safeguards that must be met in addition to state law standards."). *See generally supra* ¶ 14 (discussing the ICWA's relationship to individual states' juvenile procedures).

### 1. Attempts to Comply with the ICWA Preferences Should Begin after the Shelter Hearing.

¶ 44 In Utah, "[a] shelter hearing [must] be held within 72 hours excluding weekends and holidays after" a child is removed from his or her home.[26] Utah Code Ann. § 78A–6–306(1)(a) (Supp.2008). If the child is in DCFS' protective custody, the juvenile court must order the child released unless, among other reasons, "the child's physical health or safety may not be protected without removing the child from the custody of the child's parent" or "there is a substantial risk that the child will suffer abuse or neglect" if returned home. *Id.* § 78A–6–306(9)(a)(i), (iii). Assuming the child is not released from the State's custody, the child is then placed in accordance with certain preferences contained in section 78A–6–307. *See id.* § 78A–6–307(18)(c) ("[T]he following order of preference shall be applied when determining the person with whom a child will be placed ... (i) a noncustodial parent of the child; (ii) a relative of the child; (iii) ... a friend of a parent of the child ... (iv) other placements that are consistent with the requirements of law."). Within approximately fifteen to ninety days of the shelter hearing, the juvenile court must conduct a dispositional hearing.[27] *See id.* § 78A–6–311 to –312. As part of the dispositional hearing, "[t]he court may ... place the minor in the custody or guardianship of any: (i) individual; or (ii) public or private entity or agency." *Id.* § 78A–6–312(1)(b). Finally, a permanency hearing must be held "no later than 12 months after the original removal of the minor." *Id.* § 78A–6–314(1)(a).[28] "If a court

---

**25.** We note that, in a case where the Indian child is an adolescent, there may never be a final permanency order because the juvenile court may lose jurisdiction by the child's attainment of majority prior to any adoption or permanent guardianship.

**26.** "If necessary to protect the child, preserve the rights of a party, or for other good cause shown, the court may grant no more than one continuance, not to exceed five judicial days." Utah Code Ann. § 78A–6–306(8)(a) (Supp.2008).

**27.** The dispositional hearing must be held "no later than 30 calendar days after the date of the adjudication hearing." Utah Code Ann. § 78A–6–311(2) (Supp.2008). The "clerk of the court shall set the [adjudication] hearing ... within 15

calendar days from the later of: (a) the date of the shelter hearing; or (b) the filing of the petition" to commence proceedings alleging that a child is abused, neglected, or dependent. *Id.* § 78A–6–309(1). *See generally id.* § 78A–6–304 (defining "petition"). However, the adjudication hearing "may be continued upon motion of any party, for good cause shown," but it must be held no more than sixty calendar days from the later of the two relevant events. *See id.* § 78A–6–309(2).

**28.** "If reunification services were not ordered at the dispositional hearing, a permanency hearing shall be held within 30 days from the date of the dispositional hearing." Utah Code Ann. § 78A–6–314(1)(b).

determines [during the permanency hearing] that a child will not be returned [to his or her home] . . ., the court shall consider appropriate placement options inside and outside the state." *Id.* § 78A–6–314(9).

¶ 45 Because Utah's child welfare procedures already impose placement preferences when DCFS retains custody of a non-Indian child after a shelter hearing, *see id.* § 78A–6–307(9), 18(c), this is the natural place to require the State to begin its attempts to comply with the ICWA preferences for Indian children, *see* 25 U.S.C. § 1915(a)-(b). Not only are Utah's preferences similar to the ICWA preferences, *compare* Utah Code Ann. § 78A–6–307(1)(b)(ii), (9) & (18)(a), *with* 25 U.S.C. § 1915(b), but "[i]n the case of a child defined as an 'Indian,'" Utah's preferences expressly define "relative" to include "extended family members" as that term is defined by the ICWA, Utah Code Ann. § 78A–6–307(1)(b)(ii); *see also* 25 U.S.C. § 1903. Thus, the State preferences applicable after a shelter hearing already assume some correlation with the ICWA's preferences. Furthermore, focusing on the federal preferences at this point should ultimately reduce the time an Indian child is in a non-Indian home, which is consistent with the intent of the ICWA. *See generally* 123 Cong. Rec. 17, 21,043–44 (daily ed. June 27, 1977) (statement of Sen. Abourezk) (emphasizing the negative impact of placing Indian children in non-Indian foster care); *Problems that American Indian Families Face in Raising Their Children & How These Problems Are Affected by Federal Action or Inaction: Hearing Before the Subcomm. on Indian Affairs of the Comm. on Interior & Insular Affairs,* 93rd Cong. 58 (1974) (statement of Dr. Carl Mindell and Dr. Alan Gurwitt, Child Psychiatrists) (acknowledging "that even a short placement [in] a foster home . . . [may] have a long-term effect on a child").

2. Compliance with the ICWA Preferences Should Be Reviewed at the Dispositional Hearing and Achieved as Soon as Possible.

¶ 46 The deadline for either demonstrating compliance with the placement preferences or establishing good cause for deviating from those preferences is less readily apparent. Although arguments can be made for relying on either the dispositional hearing or the permanency hearing as the deadline for compliance with the ICWA preferences, we believe that adopting the permanency hearing as that deadline would be contrary to the purpose and intent of the ICWA. *See generally In re Adoption of Halloway,* 732 P.2d 962, 967 (Utah 1986) ("There certainly is nothing in the ICWA or its legislative history to suggest that state law controls if, in application, its subtleties bring it into conflict with the ICWA. . . ."). Time is always of the essence in child welfare proceedings. *See, e.g., In re P.H.,* 783 P.2d 565, 574 (Utah Ct.App.1989). However, this is especially true when Indian children have been placed outside of the ICWA's preferences: "[T]he Act is based on the fundamental assumption that it is in the Indian child's best interest that its relationship to the tribe be protected." *Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 49–50 n. 24, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (internal quotation marks omitted). Thus, Congress has decided, and the United States Supreme Court has acknowledged, that every day an Indian child spends outside a home that satisfies the ICWA's placement preferences is a day where the child has been placed contrary to his or her best interests. Furthermore, "Congress was concerned not solely about the interests of Indian children and families, but also about the impact on the tribes themselves of the large number of Indian children adopted by non-Indians." *Id.* at 48–49 109 S.Ct. 1597.

¶ 47 Unlike the dispositional hearing, which must be held within approximately ninety days after a child's removal, *see* Utah Code Ann. §§ 78A–6–309, –311(2), the permanency hearing can be held as late as "12 months after the original removal of the minor," *id.* § 78A–6–314(1)(a). If the State could wait until the permanency hearing to comply with the placement preferences, as argued by Appellees, a child might spend up to a year in a foster home removed from the tribe and therefore in a home contrary to his or her best interests. *See Holyfield,* 490 U.S. at 49–50 n. 24, 109 S.Ct. 1597. While a year may be an appropriate time to attempt

reunification, we conclude that it is not an acceptable period to suspend the mandates of the ICWA placement preferences.

¶ 48 Foster parents serve an essential role in our child welfare system. With each placement, the juvenile court and DCFS hope that the child will bond with her foster family, adapt to a new school, form new friendships, and look to her foster parents for affection and security. When foster placement is noncompliant and of extended duration, the very success of the placement is in conflict with the goals of the ICWA. Indeed, the Indian child's attachment to her foster parents may later be offered as good cause to avoid the ICWA preferences altogether. *Cf. In re Adoption of F.H.*, 851 P.2d 1361, 1362, 1364–65 (Alaska 1993) (considering an Indian child's bond with a foster parent the child had lived with "from June 1990 until June 1991" as part of the good cause for deviating from the placement preferences).[29] Furthermore if compliance with the ICWA is ordered after those bonds are formed, it will result in unnecessary anguish to the child and the foster parents.

¶ 49 Because compliance with the ICWA preferences should not be delayed for as long as a year and because the legislature has not yet provided a deadline specifically geared toward the ICWA preferences, we hold that compliance with those preferences should be reviewed as part of the dispositional hearing. We acknowledge that dispositional hearings can be held as early as fifteen days after the shelter hearing, which is unlikely to provide enough time to comply with the preference provisions no matter how diligent DCFS is in its attempts to do so. *See* Utah Code Ann. §§ 78A–6–309(1), –311(2) (Supp.2008). However, Utah Code section 78A–6–311(2) permits the disposition hearing to be postponed for "30 calendar days after the date of the adjudication hearing." *Id.* § 78A–6–311(2). At that time, the State should be in a position to report on its progress with the application of the ICWA placement preferences. In some instances, DCFS may have successfully completed an ICWA-compliant placement by that time. If, on the other hand, DCFS demonstrates that, despite good faith attempts, more time is needed, the juvenile court may grant a reasonable extension during which DCFS can continue its attempts to place the Indian children according to the ICWA. *Cf. T.F. v. Alaska Dep't of Health & Soc. Servs.*, 26 P.3d 1089, 1098 (Alaska 2001) (Matthews, J., dissenting) ("It should go without saying based on the supremacy clause of the federal constitution that the requirements of ICWA must be observed even if that means some slippage in the state statutory scheduling requirements." (footnote omitted)). Because the ICWA was adopted to prevent Indian children from spending even limited time separated from their Indian culture, *see, e.g., Holyfield*, 490 U.S. at 49–50 & n. 24, 109 S.Ct. 1597, and because extending the duration of a noncompliant placement increases the risk of subsequent disruption and trauma, the juvenile court should grant additional time only when DCFS can demonstrate meaningful attempts to comply with the ICWA preferences along with some articulated plan for completing those preference obligations. DCFS should be required to place the Indian children as required by the ICWA as soon as possible, which should rarely exceed the six month review provided by Utah's child welfare procedures in cases where reunification services are offered. *See* Utah Code Ann. § 78A–6–313.

---

**29.** Not all courts accept bonding with a non-Indian foster family as good cause for deviating from the ICWA preferences. *See, e.g., In re Desiree F.*, 83 Cal.App.4th 460, 99 Cal.Rptr.2d 688, 700 (2000) ("Factors flowing from [an Indian child's] current placement in flagrant violation of the ICWA, including but not limited to bonding with her current foster family and the trauma which may occur in terminating that placement, shall not be considered in determining whether good cause exists to deviate from the placement preferences set forth in the ICWA."); *In re Adoption of M.T.S.*, 489 N.W.2d 285, 288 (Minn.Ct. App.1992) ("[T]he fact that separation from [the foster family] will be initially painful to M.T.S. is not good cause to defeat the preference created by the ICWA."). This issue is not before us today, and we do not resolve it. However, in considering the timing and application of the placement preferences, we are mindful that separating children from a relatively long-term foster placement may be traumatic to children who have already suffered abuse or neglect.

¶ 50 Accordingly, we hold that the State must begin its attempts to comply with the ICWA's placement preferences immediately after the shelter hearing and that, by the dispositional hearing, it must demonstrate compliance with those preferences, good cause for deviating from them, or evidence of its prior attempts and a plan for compliance within a specified, reasonable time.

**B. The Order on Appeal Is Final for Purposes of the ICWA Preferences.**

¶ 51 In this case, Appellants appealed from the juvenile court's ruling on the dispositional hearing,[30] which Appellees acknowledge was a final, appealable order. Because in the absence of a request by the State for additional time to comply, the juvenile court's order should have included a final determination regarding the ICWA's preferences, we have jurisdiction to consider Appellants' challenge to the children's placement. Accordingly, we now consider Appellants' argument on the merits.

**C. The State Has Not Complied with the ICWA Placement Preferences.**

¶ 52 Appellants argue that the State did not comply with the placement preferences and there is no evidence establishing good cause for deviating from those preferences. *See generally* Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, 67,594 (Nov. 26, 1979) ("The burden of establishing the existence of good cause not to follow the order of preferences . . . [is] on the party urging that the preferences not be followed."). The State argues that there was good cause for an alternate placement because it has made "every effort to comply with the ICWA placement preferences," but no such placement was available. While the State may be correct, the record is inadequate on this point.

¶ 53 There is little to show that the State made diligent attempts to comply in this case. *Cf. In re Bird Head,* 213 Neb. 741, 331 N.W.2d 785, 791 (1983) ("The record . . . is devoid of any findings by the [juvenile] court as to what good cause was shown to warrant a failure to give statutorily specified preference to persons or agencies . . . designated in 25 U.S.C.[ ] § 1915(b)."). Furthermore, while the ICWA expressly requires that the State maintain records "evidencing the efforts to comply with the order of preference specified," 25 U.S.C. § 1915(e) (2000), the State concedes that no such record exists.[31] Accordingly, we must reverse and remand.[32]

## CONCLUSION

¶ 54 The juvenile court's December 5, 2007 Findings of Fact, Conclusions of Law, and Adjudication Order is affirmed in part, reversed in part, and the case is remanded for further proceedings. We affirm the juvenile court's ruling that further efforts with Grandfather would be futile. However, we reverse on the placement issue and remand to the juvenile court so that the State can immediately[33] either place the children in accordance with the ICWA's preferences or create a record demonstrating its attempts to comply and good cause for deviating from those preferences.

¶ 55 WE CONCUR: JUDITH M. BILLINGS and JAMES Z. DAVIS, Judges.

---

**30.** *See* supra ¶¶ 18–19.

**31.** We acknowledge that the State's task is made more difficult in cases, like this one, where the tribe is unresponsive. Nevertheless, the ICWA expressly requires that a record be created that documents the attempts to place the children in compliance with the ICWA preferences. *See* 25 U.S.C. § 1915(e) (2000).

**32.** By so doing, we acknowledge that the timing for compliance with the preferences was unclear, resulting in DCFS' belief that it could place the children contrary to those preferences until the permanency hearing.

**33.** Immediate action is necessary because the Indian children in this case have been placed outside of the ICWA preferences for over a year.